# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MYLAN PHARMACEUTICALS INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 1:05-CV-1416 |
| v. | : | (Judge Sylvia H. Rambo) |
| | : | |
| MERCK & CO., INC., | : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : | **FILED ELECTRONICALLY** |
| | : | |

### APPENDIX TO MYLAN'S MEMORANDUM OF LAW
### IN OPPOSITION TO MERCK'S MOTION TO DISMISS SUBMITTING
### ELECTRONICALLY AVAILABLE CASE LAW PURSUANT TO LR 7.8

| Exhibit # | Case |
|---|---|
| A | *Dr. Reddy's Laboratories, Ltd. v. aaiPharma Inc.*, No. 01 Civ. 10102(LAP), 2002 WL 31059289 (S.D.N.Y. Sept. 13, 2002) |
| B | *Ivoclar Vivadent, Inc. v. Hasel*, No. 02-CV-0316E(F), 2003 WL 21730520 (W.D.N.Y. June 30, 2003) |

| C | *Clontech Laboratories, Inc. v. Life Technologies, Inc.*, No. Civ.A. AW-00-1879, 2000 WL 33124811 (D. Md. Dec. 20, 2000) |
|---|---|
| D | *SmithKline Beecham Corp. v. Zenith Goldline Pharmaceuticals, Inc.*, No. CIV.A.00-CV-1393, 2000 WL 963165 (E.D. Pa. June 28, 2000) |
| E | *General Latex and Chemical Corp. v. BASF Corp.*, C.A. No. 99-038-SLR, 1999 U.S. Dist. LEXIS 22904 (D. Del. July 14, 1999) |

*Mylan Pharmaceuticals Inc. v. Merck & Co., Inc.*,
no. 05-cv-1416 (M.D. Pa.)  (Judge Sylvia H. Rambo)

# Appendix Exhibit A

# *Dr. Reddy's Laboratories, Ltd. v. aaiPharma Inc., No. 01 Civ. 10102(LAP), 2002 WL 31059289 (S.D.N.Y. Sept. 13, 2002)*

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
**(Cite as: 2002 WL 31059289 (S.D.N.Y.))**

**C**

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
DR. REDDY'S LABORATORIES, LTD. and Dr.
Reddy Laboratories, Inc., Plaintiffs,
v.
AAIPHARMA INC., Defendant.
**No. 01 Civ. 10102(LAP).**

Sept. 13, 2002.

Following completion of abbreviated new drug application (ANDA), applicant brought action against patentee, for declaratory judgment for noninfringement and for damages under state and federal law. Patentee moved to dismiss. The District Court, Preska, J., held that: (1) actual controversy existed; (2) allegations supported applicant's injury; and (3) patentee was not entitled to *Noerr-Pennington* immunity.

Motion denied.

West Headnotes

**[1] Declaratory Judgment 234**
118Ak234 Most Cited Cases
Abbreviated new drug application (ANDA) applicant was in reasonable apprehension of patent infringement suit by patentee, as supported existence of actual controversy in applicant's action for declaratory judgment for noninfringement against patentee; threat of infringement suits against product industry could create reasonable apprehension among all individual members of industry, parties had history of litigation, and patent had been issued at time applicant filed complaint, although patent had not yet issued at time threat was made.

**[2] Declaratory Judgment 231.1**
118Ak231.1 Most Cited Cases
Abbreviated new drug application (ANDA) applicant took concrete steps as required to establish existence of an actual controversy and bring declaratory judgment against patentee; although the applicant had not sold the drug in the United States and the product was manufactured in India, applicant had obtained tentative approval for its ANDA drug from

the Food and Drug Administration (FDA) and applicant had spent money related to obtaining FDA approval.

**[3] Torts 241**
379k241 Most Cited Cases
(Formerly 379k10(3))

**[3] Trade Regulation 981**
382k981 Most Cited Cases
(Formerly 379k10(3))

**[3] Trade Regulation 995**
382k995 Most Cited Cases
(Formerly 379k10(5))

**[3] Trade Regulation 864**
382k864 Most Cited Cases
Allegations by abbreviated new drug application (ANDA) applicant that patentee conspired to procure patents that would be listed in Orange Book, to delay launch of applicant's generic drug, and that Food and Drug Administration (FDA) required applicant to conduct expensive tests due to patentee's conduct, supported applicant's injury, as required for applicant's misappropriation of trade secrets, tortious interference with economic advantage, unfair competition, and related North Carolina law claims against patentee. N.C.G.S. § § 66-155, 75-1.

**[4] Trade Regulation 997**
382k997 Most Cited Cases
(Formerly 379k14)

**[4] Trade Regulation 864**
382k864 Most Cited Cases
Patentee was not entitled to *Noerr-Pennington* immunity on misappropriation of trade secrets, tortious interference with economic advantage, unfair competition, and related North Carolina law claims by applicant who filed abbreviated new drug application (ANDA) with Food and Drug Administration (FDA); although applicant alleged that patentee conspired with non-exclusive licensee of patent to share results of bulk testing of drug, the patentee had not actually reported the data to the FDA. N.C.G.S. § § 66-155, 75-1.

*MEMORANDUM AND ORDER*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 2
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
**(Cite as: 2002 WL 31059289 (S.D.N.Y.))**

PRESKA, J.

**\*1** Plaintiffs Dr. Reddy's Laboratories, Ltd. and Dr. Reddy Laboratories, Inc. (collectively, "DRL") bring this action for: (1) declaratory judgment for noninfringement and/or invalidity of United States Patent Nos. 6,326,384 (the " '384 Patent"), 6,268,385 (the " '385 Patent") and 6,312,712 (the " '712 Patent") against defendant aaiPharma Inc. ("aaiPharma"); and (2) damages against aaiPharma for: (a) misappropriation of trade secrets; (b) tortious interference with economic advantage; (c) unfair competition; and (d) violation of the North Carolina Unfair Trade Practices Act, N.C. Gen.Stat. § 75.1 *et seq.* aaiPharma moves to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil procedure for lack of subject matter jurisdiction with respect to Counts I and II of the complaint and for failure to state a claim upon which relief can be granted with respect to Counts III through VI. For the foregoing reasons, aaiPharma's motion to dismiss is denied.

BACKGROUND

I. Statutory Background

The Federal Food, Drug and Cosmetic Act (the "FFDCA") prohibits the sale of new drugs that are not approved by the Food and Drug Administration (the "FDA"). 21 U.S.C. § 355(a). To gain FDA approval, a company must first complete a New Drug Application ("NDA") that "demonstrates the drug's safety and efficacy for its intended uses." *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 211 F.3d 21, 25-26 (2d Cir.2000). The NDA "must include, *inter alia,* drug samples, proposed labeling, and the results of clinical safety and efficacy tests." *Id.; see also* 21 U.S.C. § 355(b).

In 1984, Congress enacted the Hatch-Waxman Amendments to the FFDCA "to permit the competitors of pioneer drug companies to obtain expedited and cost-efficient approval of generic versions of bioequivalents of drugs that have already obtained prior FDA approval." *In re Busiprone Patent Litig.,* 185 F.Supp.2d 340, 345 (S.D.N.Y.2002). [FN1] Prior to the passage of the Hatch-Waxman amendments,

> FN1. "Bioequivalence" refers to the rate at which, and the extent to which, the body absorbs the active ingredient(s) in the drug. 21 U.S.C. § 355(j)(8)(A); 21 C.F.R. § 320.1(e).

both pioneer (brand name) and generic drug manufacturers who wished to bring a drug to market were required to file a[n NDA] with the FDA. This requirement posed a formidable barrier to market entry for generic drug companies because preparation of an NDA requires expensive clinical studies demonstrating the proposed drug's safety and effectiveness. In addition, a generic manufacturer could not begin the necessary research and clinical studies until any patents on the brand name drug it sought to copy had expired because its research efforts would have infringed the patents held by the pioneer drug company. This meant that a pioneer drug company's monopoly on its brand name drug was effectively extended to include not only the terms of any patents on the brand name drug, but also the time it took generic competitors to complete the NDA process after these patents had expired.

*aaiPharma Inc. v. Thompson,* 296 F.3d 227, 230-31 (4th Cir.2002).

**\*2** Under the Hatch-Waxman Amendments, "the original application for FDA approval (the 'pioneer' applicant) must still prepare an NDA. Subsequent applicants who wish to manufacture generic versions of the pioneer drug, however, need only complete an Abbreviated New Drug Application (ANDA) that relies on the FDA's previous determination that the drug is safe and effective." *Andrx Pharm., Inc. v. Biovail Corp. Int'l,* 256 F.3d 799, 801 (D.D.C.2001) (footnotes omitted). In other words, an ANDA is essentially a "piggy-back on the pioneer drug's human clinical trials and labeling." *SmithKline Beecham,* 211 F.3d at 26 (citations omitted).

The Hatch-Waxman Amendments further provide that the pioneer applicant's NDA filing "must include information on any patent that 'claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.' " *In re Busiprone,* 185 F.Supp.2d at 345 (citing 21 U.S.C. § 355(b)(1)). "If a pioneer drug company obtains a patent that meets these criteria after the NDA has been filed or approved, the company is required to file supplemental information, on the new patent within thirty days of the issuance of the new patent." *Id.* (citing 21 U.S.C. § § 355(b)(1) & (c)(2)). "Upon approval of an NDA or receipt of supplemental patent information, the FDA publishes the submitted patent information in a book called the 'Approved Drug Products with Therapeutic

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
**(Cite as: 2002 WL 31059289 (S.D.N.Y.))**

Equivalence Evaluations,' commonly referred to as the 'Orange Book.' ' *Id.* (citing 21 U.S.C. § § 355(b)(1) & (c)(2)).

"[W]hen a generic maker files an ANDA seeking approval of a generic version of a drug that is listed in the Orange Book, the applicant must certify that any patent information listed in the Orange Book does not bar FDA approval of a generic version of the drug." *Mylan Pharms., Inc. v. Thompson,* 139 F.Supp.2d 1, 6 (D.D.C.) (citing 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12)), *rev'd on other grounds,* 268 F.3d 1323 (Fed.Cir.2001). ANDA applicants have four certification options:
> (I) that no patent information on the drug product that is the subject of the ANDA has been submitted to the FDA; (II) that the patent has expired; (III) that the patent will expire on a stated date; or (IV) that the patent is invalid or will not be infringed by the manufacture, use, or sale of the drug for which the ANDA applicant seeks approval.

*Id.* (citing 21 U.S.C. § § 355(j)(2)(A)(vii)(I) to (IV)).

II. Factual Background

*General Facts*

Prilosec is the brand name of a pharmaceutical product sold by AstraZeneca ("AstraZeneca"). (Am.Compl.¶ 29). The generic version of Prilosec is omeprazole. (*Id.* ¶ ¶ 29-30). Prilosec is an extended-release omeprazole product that is prescribed for gastroesophageal reflux disorder, peptic ulcer and other gastrointestinal ailments. (*Id.* ¶ 30).

*3 DRL filed an ANDA with the FDA seeking approval to sell an omeprazole product. (*Id.* ¶ 12). On June 25, 2001, DRL obtained tentative approval of its omeprazole ANDA from the FDA. (Certification of Andrew J. Miller in Opposition to Motion to Dismiss ("Miller Cert.") ¶ 14). [FN2] DRL asserts that, upon final FDA approval of DRL's omeprazole product, DRL intends to market the product in the United States. (Am.Compl.¶ 12). Further, DRL claims that it has spent "several million dollars to develop its product," which includes "all costs related to obtaining FDA approval and construction of a plant to manufacture its omeprazole product." (Miller Cert. ¶ 13).

> FN2. Where a defendant raises factual issues concerning jurisdiction, it is appropriate for the Court to look at evidence presented outside the complaint for resolution. *Indium*

*Corp. v. Semi-Alloys,* 781 F.2d 879, 884 (Fed.Cir.1985).

*Allegations Regarding Patent Infringement*

aaiPharma is the owner by assignment of the '384, '385 and '712 Patents. (Am.Compl.¶ ¶ 9-11). The '385 Patent was issued on July 31, 2001; the ' 712 Patent was issued on November 6, 2001; and the '384 Patent was issued on December 4, 2001. (*Id.,* Exs. A, B, C). All three patents deal with omeprazole. (*See id.*).

DRL alleges that aaiPharma has stated that it would license the '384, '385 and '712 Patents to generic companies. (*Id.* ¶ 14). DRL further alleges that aaiPharma "has threatened to file a lawsuit if DRL refuses to purchase a license under its omeprazole related patents, which include the '384, '385 and '712 [P]atents." (*Id.*).

While DRL does not specify in its complaint the sources of aaiPharma's alleged threats against DRL, it appears that those sources are two Wall Street Journal articles published on July 20, 2001 and August 10, 2001, respectively. The July 20 article provides in pertinent part:
> In another sign of the legal hurdles facing generic-drug companies, a North Carolina research company received two patents Tuesday that may delay the launch of cheap generic versions of the huge-selling ulcer drug Prilosec.
> Aai Pharma Inc. of Wilmington, N.C., said its patents describe the ratio of two crystalline structures within Prilosec, and that generic companies are unlikely to be able to make Prilosec properly without using--and therefore paying for--Aai's discoveries. Prilosec is made by AstraZeneca PLC, which has a nonexclusive licensing agreement to the patents, said Fred Sancilio, aaiPharma's chairman and chief executive.
> Mr. Sancili said he would offer to license the patents to generic makers but not necessarily on the same terms offered AstraZeneca. *If generic companies refuse to pay his company, "I think there is a threat of a lawsuit" filed by Aai against the generic companies, he said.*
> Aai's patents could prove beneficial to AstraZeneca, which has been fighting for years to extend its exclusive hold on Prilosec, the world's biggest-selling brand drug with $6 billion in annual sales. AstraZeneca's exclusive rights to Prilosec expire in October....
> Mr. Sancilio said his company finally figured out the true chemical structure of Prilosec, something

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
**(Cite as: 2002 WL 31059289 (S.D.N.Y.))**

he contends AstraZeneca has never known and originally described incorrectly when the drug was patented and approved for sale.

*4 If AstraZeneca chooses to list Aai'a patents in a federal registry called the orange book, the patents could delay generic competitors to Prilosec by as much as 30 months--which would be a multibillion dollar boon to AstraZeneca but harm consumers, the generic makers say.

(Defendant's Notice of Motion to Dismiss All Claims, Declaration of Johnathan L. Greenblatt in Support of Defendant's Motion to Dismiss All Claims, sworn to on February 6, 2000 ("Greenblatt Decl."), Ex. B (emphasis added)).

The August 10 article, in turn, provides in pertinent part:

AaiPharma Inc.'s (AAII) stock tumble earlier in the session Friday was a result of investors misunderstanding how AstraZeneca PLC's (AZN) decision not to list the company's patent on for omeprazole in the Food and Drug Administration's Orange Book would affect the company, according to company officials.

AaiPharma's founder and Chief Executive Fred Sancilio told the Dow Jones Newswires Friday that AstraZeneca's decision will actually allow AaiPharma to license the active ingredient of AstraZeneca's top-selling ulcer medicine Prilosec to generic makers, once Prilosec comes off the patent....

Much of Friday's sell-off was prompted by the looming concern that Andrx Group (ADRX) is waiting in the wings to launch a generic version of Prilosec in October when certain patents for AstraZeneca's branded version expires....

AaiPharma's Sancilio said Andrx, along with other generic drug makers, will in all likelihood have to come to Aaipharma in order to license the key ingredients for a generic Prilosec.

*He said it would be difficult to make a generic Prilosec without violating the patents that are already in place for the Aaipharma's compunds.*

*"If they just license the patents from us, it would eliminate a big obstacle in their way," Sancilio said.*

(*Id.*, Ex. A (emphasis added)).

*Allegations Regarding DRL's Remaining Claims*

Beginning in the mid-1990s, aaiPharma and DRL began a relationship whereby DRL would supply bulk products, including omeprazole, to aaiPharma so that aaiPharma could determine whether to file an ANDA for a finished dosage product, which would contain DRL's bulk product. (Am.Compl.¶ 18). According to DRL, "[t]here was an understanding between DRL and aaiPharma that the shipment of bulk product, including DRL's shipment of its bulk omeprazole to aaiPharma, was for aaiPharma's determination of whether to file an ANDA and for no other purpose." (*Id.* ¶ 21). DRL alleges that DRL's bulk omeprazle is a trade secret because "it contains formula and involves processes which give DRL an advantage over its competitors," (*id.* ¶ 19), and that DRL has expended "a large amount of money and effort" to maintain that trade secret, (*id.* ¶ 20). DRL alleges that aaiPharma breached its duty of confidentiality and used DRL's bulk omeprazole "for purposes other than for the filing of an ANDA." (*Id.* ¶ 22-23). Specifically, DRL alleges that aaiPharma and AstraZeneca conspired to obtain DRL's trade secrets, whereby aaiPharma tested the bulk product it received from DRL "in order to find ways to keep DRL's generic bulk omeprazole product off the market and to extend Astra[Zeneca]'s monopoly" and shared DRL's trade secrets and aaiPharma's test results with AstraZeneca. (*Id.* ¶ ¶ 24-26). The purpose of this conspiracy was to "keep DRL's generic omeprazole off the market." (*Id.* ¶ 28).

*5 Further, DRL alleges, aaiPharma and AstraZeneca entered into an agreement allowing aaiPharma to procure patents that would then be listed in the Orange Book by AstraZeneca. (*Id.* ¶ 32). This listing would "delay any launch of generic products[,] resulting in financial loss to the generic companies [such as DRL] and financial gain to AstraZeneca." (*Id.*). When AstraZeneca "realized it could not list the omeprazole patents in the orange book," DRL alleges, "it used the data received from aaiPharma to attempt to delay DRL's launch of generic omeprazole by submitting the data to the FDA and contending that DRL's bulk was not bioequivalent to Prilosec." (*Id.* ¶ 34). In response to this submission, the FDA "requested that DRL run tests costing hundreds of thousands of dollars, delaying DRL's approval and adversely impacting DRL's entitlement to Hatch-Waxman exclusivity." (*Id.* ¶ 36).

*Prior Related Litigation*

On July 26, 2001, Dr. Reddy's Laboratories, Ltd., which is a plaintiff in the instant case, and Reddy-Cheminor, Inc., which is not, filed a complaint against aaiPharma in the United States District Court for the Southern District of New York, docket no. 01 Civ. 6859. The Honorable Barbara S. Jones accepted reference of the case. On August 7, 2001, DRL filed

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
**(Cite as: 2002 WL 31059289 (S.D.N.Y.))**

an amended complaint (the "6859 Complaint") seeking a declaration of patent invalidity and noninfringement with respect to three patents, all of which are owned by aaiPharma: U.S. Patent No. 6,262,085 (the " '085 Patent"), U.S. Patent No. 6,262,086 (the " '086 Patent"), and the '385 Patent . [FN3] On September 5, 2001, aaiPharma filed an answer to the amended complaint. (Greenblat Decl., Ex. C). That case is still pending.

> FN3. Apparently, the '085 Patent and the '086 Patent--both of which were issued on July 17, 2001--are the two patents to which the July 20, 2001 Wall Street Journal article refers.

Further, on August 3, 2001, Andrx Pharmaceuticals, Inc. filed a complaint against aaiPharma in the United States District Court for the Southern District of New York that, like DRL's amended complaint against aaiPharma in front of Judge Jones, seeks a declaration of noninfringement and invalidity with respect to the '085, '086 and '385 Patents. That case is also pending.

### DISCUSSION
I. Declaratory Judgment Claim

A. Legal Standard

The Declaratory Judgment Act limits issuance of a declaratory judgment to cases of "actual controversy." 28 U.S.C. S 2201(a). If no actual case or controversy exists between the parties regarding the subject on which declaratory judgment is sought, the court lacks subject matter jurisdiction. [FN4] *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239-40, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *Solenoid Devices, Inc. v. Ledex, Inc.,* 375 F.2d 444, 445 (9th Cir.1967); *Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631, 634 (Fed.Cir.1991) (where there is no actual controversy, the court has no discretion to decide the case). An actual controversy is one that is definite and concrete, not abstract or hypothetical. *American Cyanamid Co., v. Ethicon, Inc.,* 443 F.Supp. 46, 48 (S.D.N.Y.1977) (citing *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 239-41, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). In *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941), the Supreme Court noted:

> FN4. To determine the validity of a patent absent a case or controversy "would involve the court in rendering a forbidden advisory

opinion." *Arrowhead Indus. Water, Inc. v. Ecolochem,* 846 F.2d 731, 735 (Fed.Cir.1988).

*6 The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.
*Id.* at 273.

To establish an "actual controversy" in a patent invalidity declaratory action there must be (1) an explicit threat or action by the patentee, which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and (2) plaintiff must actually have either produced the device or have prepared to produce the device. *Arrowhead Indus. Water, Inc. v. Ecolochem,* 846 F.2d 731, 736 (Fed.Cir.1988); *see also Spectronics Corp.,* 940 F.2d at 634; *B.P. Chem. Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978 (Fed.Cir.1993). If either of these two requirements is not met, dismissal for lack of subject matter jurisdiction is required. *Lex Computer & Management Corp. v. CBS Inc.,* 684 F.Supp. 811, 813 (S.D.N.Y.1988), *aff'd,* 861 F.2d 1095 (Fed.Cir.1989). "[T]he 'actual controversy' must be extant at all stages of the review, not merely at the time the complaint is filed." *Super Sack Mfg. Corp. v. Chase Packaging Corp.,* 57 F.3d 1054, 1058 (Fed.Cir.1995) (quoting *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975)).

While an actual controversy exists if there is an express charge of infringement, *Premo Pharm. Labs., Inc. v. Pfizer Pharm., Inc.,* 465 F.Supp. 1281, 1283 (S.D.N.Y.1979), the Federal Circuit has also stated that it "cannot read the Declaratory Judgment Act so narrowly as to require that a party actually be confronted with an express threat of litigation to meet the requirements of an actual case or controversy." *Goodyear Tire v. Releasomers, Inc.,* 824 F.2d 953, 956 (Fed.Cir.1987). Absent an express charge of infringement, a declaratory judgment plaintiff must establish an actual controversy on the "totality of the circumstances" surrounding the claim. *Id.; see also Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 888

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
(Cite as: 2002 WL 31059289 (S.D.N.Y.))

Page 6

(Fed.Cir.1992). In a motion to dismiss, the plaintiff has the burden of proving that its apprehension of suit was reasonable. *Shell,* 970 F.2d 885, 887.

Conduct producing a reasonable apprehension that a patent lawsuit may be filed can be subtle. *EMC Corp. v. Norand Corp.,* 89 F.3d 807, 811 (Fed.Cir.1996). Relevant to the issue of reasonable apprehension can be the fact that the parties are engaged in litigation at the time the perceived threat is made or the fact that the patent holder has stated an intent to enforce its patent rights. *Arrowhead,* 846 F.2d at 737. It is true that some cases have held such facts insufficient to find a reasonable apprehension of suit. *Premo Pharm. Labs.,* 465 F.Supp. 1281 (defendant's having filed 38 previous lawsuits against other alleged infringers insufficient to raise reasonable apprehension of suit); *Volkswagen of America, Inc. v. Engelhard Minerals & Chem. Corp.,* 401 F.Supp. 1210, 189 U.S.P.Q. (BNA) 297, 299-300 (S.D.N.Y.1975) (parties had debated the validity of patent in question but no actual accusation of infringement). Nonetheless, this Court has held that it must consider the context in which statements allegedly raising an apprehension of suit were made. *See American Cyanamid,* 443 F.Supp. at 46 (statements by employees of a defendant patent owner were insufficient in context).

*7 Nevertheless, "[e]ven if there is an actual controversy, 'the district court is not required to exercise declaratory jurisdiction, but has discretion to decline that jurisdiction." ' *Cygnus Therapeutics Systems v. Asza Corp.,* 92 F.3d 1153, 1158-59 (1996) (quoting *EMC Corp.,* 89 F.3d at 810).

B. Actual Controversy

1. Reasonable Apprehension

[1] In its motion to dismiss, aaiPharma argues that DRL was not in reasonable apprehension of a patent infringement suit by aaiPharma with respect to the '384, '385 and '712 Patents. aaiPharma emphasizes that, with respect to its comments in the two Wall Street Journal articles, "DRL is merely one of many generic companies that manufacture omeprazole products and/or filed an Abbreviated New Drug Application ("ANDA") on omeprazole that may or may not fall within the scope of the '384, '384 and/or '712 [P]atents," (aaiPharma's Mem. Support Mot. Dismiss All Claims at 4), and therefore, "aaiPharma's alleged statements directed to the generic industry as a whole do not reach the level of an objective, immediate and actual threat of a suit by aaiPharma," (*id.* at 7). Further, aaiPharma asserts that both the

'384 Patent and '712 Patent were issued after the two Wall Street Journal articles had issued, "negating the articles as being a threat to sue on these patents." (aaiPharma's Reply Mem. Support Mot. Dismiss All Claims at 5).

It is true that the comments made by aaiPharma regarding potential infringement suits were directed at generic omeprazole manufacturers as a whole and not DRL specifically. For purposes of DRL's reasonable apprehension that it would be subject to an infringement suit, however, this is a distinction without a difference: threats of infringement suits against an entire product industry can create reasonable apprehension among all individual members of that industry. *See, e.g., DuPont Merck Pharm. Co. v. Bristol-Myers Squibb Co.,* 62 F.3d 1397, 1401 (Fed.Cir.1995) (finding that court possessed jurisdiction over plaintiff's declaratory judgment action, based upon, *inter alia,* defendant's threat to bring patent infringement suits against generic drug manufacturers who attempt to market their products during the twenty-year period after the patent was first filed, which created a reasonable apprehension that plaintiff would face an infringement suit; *Sigma Tau Industrie Farmaceutiche Riunite S.P .A. v. Lonza, Ltd.,* 36 F.Supp.2d 26, 30 n. 5 (D.D.C.1999) ("The threat of infringement does not have to be directed against plaintiffs specifically. It is sufficient to create a reasonable apprehension if plaintiffs' customers, or other competitors, are threatened."); *Nippon Electric Glass Co. v. Sheldon,* 489 F.Supp. 119, 121 (S.D.N.Y.1980) ("The accusation [of infringement] need not be made directly to the declaratory judgment plaintiff, but may be made to its customers or the industry at large."); *Airship Indus. (UK) Ltd. v. Goodyear Tire & Rubber Co.,* 643 F.Supp. 754, 759 (S.D.N.Y.1986) (same) (quoting *Nippon* ); *Micro-Mega S.A. v. Jacklich,* No. 84 Civ. 2943, 1985 WL 1246, at *3 (E.D.N.Y. Jan.4, 1985) ("For example, if the patentee has threatened to sue for infringement the plaintiff's customers or warned the industry to which plaintiff belongs of patentee's rights, both situations have been held to be sufficient."); 10B Wright, Miller & Kane, Federal Practice & Procedure 3d, Patents, Copyrights § 2761 ("[T]he courts have held that a charge by the patentee that the device is an infringement is a prerequisite to finding an actual controversy, but the requirement of a charge is liberally construed. If the patentee has threatened an infringement suit or has notified the trade that a competitor is infringing, this is enough ...." (emphasis added) (footnote omitted)). [FN5]

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
(Cite as: 2002 WL 31059289 (S.D.N.Y.))

FN5. aaiPharma also suggests that it is clear from the text of the two Wall Street Journal articles "that there is no threat of litigation; indeed, the articles simply advise the generic companies of the existence of some patents and let them know that licenses are available." (aaiPharma's Reply Mem. Supp. Mot. Dismiss All Claims at 2-3). aaiPharma's suggestion is belied by the plain language of its chief executive, Fred Sancilio, quoted in the July 20 article. Mr. Sancillo specifically stated that "[i]f generic companies refuse to pay his company, 'I think there is a threat of a lawsuit' filed by Aai against the generic companies." (Greenblatt Decl., Ex. B).

*8 Further, it is true that, at the time the Wall Street Journal articles were published, two of the three patents upon which DRL seeks a declaratory judgment had not yet been issued. It is axiomatic that DRL cannot obtain a declaratory judgment of invalidity and/or noninfringement on a patent that has not yet been issued by the PTO at the time the complaint was filed. *See, e.g., Gaf Building Materials Corp. v. Elk Corp.,* 90 F.3d 479, 482 (Fed.Cir.1996) ( "[A] threat is not sufficient to create a case or controversy unless it is made with respect to a patent that has issued before a complaint is filed."). Nonetheless, one can still be in reasonable apprehension of an infringement suit with respect to a patent that had not yet been issued at the time the alleged infringer was threatened, so long as that patent has issued at the time the complaint was filed. *See, e.g., id.* at 480, 482 (finding that plaintiff was in reasonable apprehension of infringement suit; letter threatening infringement suit was sent two months before patent actually issued). Here, aaiPharma's threatening public statements directed to the generic omeprazole-manufacturing industry coupled with the fact that all three patents at issue in DRL's declaratory judgment action deal with omeprazole leads to the conclusion that DRL had a reasonable apprehension that it would be sued for patent infringement on the '384 and '712 Patents even though those patents had not yet been issued when the Wall Street Journal articles were published. Indeed, aaiPharma does not dispute that, at the time the Amended Complaint was filed, the '384, '385 and '712 Patents had all been issued.

Additional support for DRL's reasonable apprehension of an infringement suit by aaiPharma can be found in the parties' prior litigation history. In addition to the 6859 Complaint and the Andrx

Pharmaceuticals, Inc. / aaiPharma litigation described earlier, there are three cases filed by aaiPharma against Dr. Reddy's Laboratories, Ltd. and several other manufacturers in the United States District Court for the Eastern District of North Carolina, Southern Division. (Miller Cert. ¶ ¶ 1, 5 & Exs. A, B, C). It is true that those cases involve a dispute over the manufacture of generic versions of Prozac (which aaiPharma had its own patents on), rather than Prilosec. *(Id.).* Further, aaiPharma asserts that Dr. Reddy's Laboratories, Ltd. and Reddy-Cheminor, Inc. sued aaiPharma first with respect to the Prozac cases, again seeking a declaratory judgment, and it was only afterwards that aaiPharma sued those plaintiffs for infringement of aaiPharma's Prozac patents. (aaiPharma's Reply Mem. Supp. Mot Dismiss All Claims at 3). Nonetheless, these facts demonstrate a significant legal history among the parties with respect to the manufacture of generic drugs, including omeprazole. [FN6]

FN6. Along the same lines, I note that Mr. Miller, in his certification as counsel for DRL, asserts that he spoke with Steve Fontana, in-house counsel for aaiPharma, concerning aaiPharma's attempt to license its patents on generic Prozac to DRL. (Miller Cert. ¶ 8). Miller states that, during those conversations, Fontana told him that "aaiPharma would not link the resolution of the generic Prozac® matter with discussions concerning generic Prilosec® because what aaiPharma was demanding for its generic Prozac® was negligible compared to the very very significant sum which it intended to demand in the near future with respect to the generic Prilosec® patents." *(Id.* ¶ 9).

Finally, aaiPharma asserts that, with respect to the 6859 Complaint pending in front of Judge Jones, aaiPharma filed an Answer in September 2001 that "affirmatively pled that it did not know how Dr. Reddy manufactures omeprazole or whether it infringes the patents in that litigation, which includes the ' 385 patent in suit here." (aaiPharma's Mem. Support Mot. Dismiss All Claims at 4; *see* Greenblat Decl., Ex. C, ¶ 21). Therefore, aaiPharma argues, "prior to the filing of this suit, DRL and its counsel were on notice that aaiPharma was still uncertain about its infringement position vis-à-vis DRL's omeprazole." (aaiPharma's Mem. Supp. Mot. Dismiss All Claims at 4). This argument is without merit. Regardless of any statements made by aaiPharma in its responsive pleadings in other cases, DRL was still in reasonable apprehension of an infringement suit by

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
(Cite as: 2002 WL 31059289 (S.D.N.Y.))

aaiPharma, given aaiPharma's threats to the generic omeprazole industry. *See, e.g., Applexion S.A. v. Amalgamated Sugar Co.,* No. 95 C 858, 1995 WL 229049 (N.D.Ill. Apr.17, 1995):

> *9 The fact that Amalgamated may not have comprehensive information about the Applexion process does not dispel the reasonable apprehension of suit that Amalgamated's acts [alleging infringement] created. *See Arrowhead Indus. Water,* 846 F.2d at 739 (patent holder's assertions that declaratory plaintiff had not disclosed enough about its process "comes with poor grace" given fact that patent holder had charged infringement). Even if it did not know with certainty whether Spreckels would use the process in an infringing manner, Amalgamated's acts created a reasonable apprehension that it would sue if the process were sold or used.

*Id.* at *5 (footnote omitted); *see also, e.g., Sumitomo Elec. Indus. Ltd. v. Corning, Inc.,* 169 F.Supp.2d 440, 446 (M.D.N.C.2001) ("Corning's lack of both knowledge and information about Sumitomo's DCF cable eliminates the possibility of a direct allegation of infringement, but not an indirect one.... The patentee's intent or knowledge does not dictate the analysis, its conduct does."); *Glaxo Wellcome, Inc. v. Pharmadyne Corp.,* Civ. No. AMD-96-455, 1996 WL 432290, at * (D.Md.1996) ("Glaxo's statements that it has no basis for determining if Pharmadyne is in fact infringing the '431 patent, and that it has no plans to sue Pharmadyne on the '431 patent now, are to no avail. Even promises not to sue have been held insufficient to abate a declaratory plaintiff's fear."); *Mobil Oil Corp. v. Advanced Equip. Recycling Techs., Inc.,* 826 F.Supp. 112 (D.Del.1993) (patentee's admission of non-infringement did not extinguish controversy absent a formal covenant not to sue, or a judicial determination of non-infringement).

2. Production or Preparation of Device

[2] aaiPharma argues that DRL has also failed to establish an "actual controversy" because DRL has not demonstrated that it is engaged in "present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." (aaiPharma's Reply Mem. Supp. Mot. Dismiss All Claims at 6 (quoting *B.P. Chem.,* 4 F.3d at 978)). To support its position, aaiPharma asserts, *inter alia,* that DRL has not yet sold any omeprazole product in this country and that DRL manufactures its product in India. (aaiPharma's Mem. Supp. Mot. Dismiss All Claims at 10).

Contrary to aaiPharma's arguments, DRL has established an actual controversy here. In June 2001, DRL obtained tentative approval of its omeprazole ANDA from the FDA. (Miller Cert. ¶ 14). Further, "DRL has spent several million dollars to develop its product, including all costs related to obtaining FDA approval and construction of a plant to manufacture its omeprazole product." (*Id.* ¶ 13). These facts satisfy the "concrete steps" requirement of a declaratory judgment action. *See Glaxo Group Ltd. v. Apotex, Inc.,* 130 F.Supp.2d 1006, 1008 (N.D.Ill.2001) ("[D]efendant has filed and the FDA has accepted for filing the ANDA, which, as both parties recognize, means that defendant is ready or has at least made meaningful preparations to be ready to market the allegedly infringing product."); *Mylan Pharms., Inc. v. Thompson,* 139 F.Supp.2d 1, 15-16 (D.D.C.) ("Mylan is in a position to begin marketing its generic product immediately upon FDA approval. Indeed, Mylan has already developed a generic equivalent of BuSpar(R), filed an ANDA with respect to that product, obtained tentative FDA approval of its ANDA, and packed its buspirone product into trucks and onto the loading dock on November 21, 2000 in anticipation of final FDA approval."), *rev'd on other grounds,* 268 F.3d 1323 (Fed.Cir.2001); *Glaxo, Inc. v. Novopharm, Ltd.,* 110 F.3d 1562, 1571 (Fed.Cir.1997) (finding an actual controversy where, *inter alia,* alleged future infringer "indicated that it had submitted an ANDA accompanied by data sufficient to make FDA approval imminent," which demonstrated that alleged future infringer was "systematically attempting to meet the applicable regulatory requirements while preparing to import its product"); *Hoechst Marion Roussel, Inc. v. Par Pharm., Inc.,* Civ. No. 95-3673(DRD), 1996 WL 468593, at *5 (D.N.J. Mar. 14, 1996) ("Par's filing of an ANDA constituted a meaningful step towards the purpose of making, using or selling the generic drug.").

*10 Even when, as aaiPharma alleges, one has not yet committed an allegedly infringing act in the United States, it is still possible--as aaiPharma readily admits--for one to take concrete steps towards that allegedly infringing act. DRL has demonstrated that it has taken those steps here. [FN7]

> FN7. aaiPharma makes two additional arguments as to why DRL has not taken concrete steps towards infringement to support declaratory judgment jurisdiction. *First,* aaiPharma asserts that "Andrx, not DRL, is the only approved generic omeprazole supplier" because Andrx "was

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
**(Cite as: 2002 WL 31059289 (S.D.N.Y.))**

the first to challenge the innovator's (Astra-Zeneca) patents with a so-called Paragraph 4 certification of invalidity and/or non-infringement." (aaiPharma's Reply Mem. Supp. Mot. Dismiss All Claims at 6-7). According to aaiPharma, DRL has recently filed suit against the FDA seeking relief from the ruling that Andrx has exclusive rights, and "[a]t least until that suit is resolved, DRL has to wait until Andrx's exclusive marketing rights expire before it can be approved by the FDA and infringing sales commerce." (*Id.* at 7).

*Second,* aaiPharma asserts that "approval of DRL's omeprozole [sic] also appears to be dependent on the outcome of an extensive patent litigation trial currently being conducted by Judge Jones between Astra-Zeneca and four generic companies including both Andrx and DRL involving numerous Astra-Zeneca patents. If Astra-Zeneca prevails in that litigation, then DRL's approval may be delayed another five years." (*Id.* at 7).

I reject both of these arguments. Among other things, the arguments are entirely devoid of the detail that would be necessary for me to consider them. aaiPharma provides no factual or legal citations to support its assertions. Further, with respect to the trial before Judge Jones, aaiPharma gives no description of what products the aforementioned patents cover nor any explanation as to how that litigation will cause delay in DRL's approval.

## II. Remaining Claims

Counts III through VI of the amended complaint allege: (1) misappropriation of trade secrets; (2) tortious interference with economic advantage; (3) unfair competition; and (4) violation of the North Carolina Unfair Trade Practices Act, N.C. Gen.Stat. § 75.1 *et seq.* aaiPharma asserts that DRL's "unfair or deceptive acts or practices claims," *viz.,* Counts III through VI, should be dismissed. aaiPharma argues DRL has failed to sufficiently plead injury as a result of the alleged acts of aaiPharma, as required in both civil actions for damages generally and as required specifically by both the North Carolina Trade Secrets Protection Act (N.C.G.S.A. § 66-155) and the North Carolina Unfair Trade Practices Act (N.C.G.S.A. § 75-1). [FN8] aaiPharma further argues that, even assuming that DRL has sufficiently pled injury, aaiPharma's activities are immune under the *Noerr-*

*Pennington* doctrine.

FN8. The parties appear to assume that North Carolina law applies to DRL's state law claims, but neither party addresses at all the relevant choice of law considerations. A federal court sitting in diversity must apply the choice of law rules of the forum state, in this case New York. *Tri-State Employment Serv. v. Mountbatten Security Co.,* 295 F.3d 256, 260 (2d Cir.2002). In tort cases, New York courts have adopted an "interest analysis" to determine which jurisdiction has the "greate[st] interest in having its law applied in the litigation." *Ackerman v. Price Waterhouse,* 252 A.D.2d 179, 683 N.Y.S.2d 179, 188 (App. Div. 1st Dep't 1998); *see also Elgin Sweeper Co. v. Melson Inc.,* 884 F.Supp. 641, 650 n. 12 (N.D.N.Y.1995) (Scullin, J.) ("In New York, the choice of law for tort causes of action is based upon the place which has the most significant contacts with the matter in dispute, thereby giving the place with the most interest in the problem paramount control over the legal issues arising in the case."). Under this approach, "the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Schultz v. Boy Scouts of Am., Inc.,* Inc., 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). "[T]he locus in [a tort] case is determined by where the plaintiffs' injuries occurred." *Id.* "The place in which the injury is deemed to have occurred 'is usually where the plaintiff is located." ' *Cromer Fin. Ltd. v. Berger,* 158 F.Supp.2d 347, 357 (S.D.N.Y.2001) (quoting *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282, 292 (S.D.N.Y.2000) (citation omitted)). Here, it is alleged that plaintiff Dr. Reddy's Laboratories, Ltd. is an Indian corporation with its principal place of business in India, (Am.Compl.¶ 1); plaintiff Dr. Reddy's Laboratories, Inc. is a New Jersey corporation with its principal place of business in New Jersey, (*id.* ¶ 2); aaiPharma is a Delaware corporation with its principal place of business in North Carolina and regularly conducts business in New York; (*id.* ¶ 3), and non-party Astra-Zeneca is a limited partnership under the laws of Delaware with its principal place of business in Pennsylvania, (*id.* ¶ 5). Presumably, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
(Cite as: 2002 WL 31059289 (S.D.N.Y.))

plaintiffs' injuries have occurred in India and New Jersey, where those companies are incorporated. For purposes of aaiPharma's motion to dismiss, however, I need not actually determine which law is applicable to DRL's claims, as DRL has sufficiently pled injury.

A. Injury

[3] aaiPharma asserts that "DRL has utterly failed to properly [sic] allege injury from aaiPharma's activity." (aaiPharma's Mem. Supp. Mot. Dismiss All Claims at 11). According to aaiPharma, "DRL has not plead that it is prepared to bring an omeprazole drug to market or that, but for aaiPharma's alleged acts, it would have anticipated FDA approval." (*Id.*). Absent such pleadings, aaiPharma asserts, there is no nexus between the alleged acts and the asserted injury:

> Initially, DRL argues that because the FDA required them to do additional testing and that testing cost money, DRL was harmed. DRL fails to demonstrate, however, any proximate causal connection between any furnishing of information to the FDA and a decision by the FDA to ask DRL for additional information or testing. aaiPharma does not control the FDA. The FDA exercises its own judgment. Apparently in the FDA's judgment, something associated with DRL's product created a health and/or safety concern, or raised regulatory questions, that required more testing or information. Whatever factor or factors caused the FDA to ask for more testing or information from DRL is unknown and a matter of speculation. aaiPharma cannot be held responsible for the FDA's actions protecting the public interest.

(aaiPharma's Reply Mem. Supp. Mot. Dismiss All Claims at 10-11).

aaiPharma's argument is meritless. Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 8 does not require "a claimant to set out in detail the facts upon which he bases his claim." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).*

*11 DRL alleges, *inter alia,* that aaiPharma conspired with AstraZeneca to allow aaiPharma to procure patents that would be listed in the Orange Book. (Am.Compl.¶ 32). When that plan failed,

DRL alleges, AstraZeneca used the data that aaiPharma misappropriated from DRL "to attempt to delay DRL's launch of generic omeprazole by submitting the data to the FDA and contending that DRL's bulk was not bioequivalent to Prilosec®." (*Id.* ¶ 34). "In response to Astra [Zeneca]'s submission of such data," DRL alleges, "the FDA has requested that DRL run tests costing hundreds of thousands of dollars, delaying DRL's approval and adversely impacting DRL's entitlement to Hatch-Waxman exclusivity." (*Id.* ¶ 36). These statements sufficient plead DRL's alleged injury, notwithstanding the fact that aaiPharma does not have control over the FDA.

For example, in a recent patent infringement case, *Ely Lilly & Co. v. American Cyanamid Co.,* No. IP95-0536-C-B/S, 2001 WL 30191 (S.D.Ind. Jan.8, 2001), the court considered a motion to dismiss defendant/counterclaimant Zenith Laboratories, Inc.'s ("Zenith") amended counterclaim, in which Zenith alleges violation of Section 1 of the Sherman Act. *Id.* at *1. Zenith alleged that plaintiff/counterclaim defendant Ely Lilly & Co. ("Lilly"), in anticipation of the expiration of two of its patents on the antibiotic cefaclor, "began developing strategies to identify potential generic manufacturers of cefaclor and then to prevent them from producing cefaclor." *Id.* (citation omitted). Lilly implemented this strategy, Zenith alleged, by commencing an "outsourcing" program "to tie up the manufacturing capacity of potential manufacturers of bulk cefaclor so that they could not or would not produce cefaclor for sale in competition with Lilly, particularly in Lilly's most profitable market, the United States." *Id.* (citation omitted). Zenith alleged that it was injured by Lilly's anti-competitive behavior because Lilly prevented Zenith from entering the generic cefaclor market in the United States until approximately five months after Lilly's patents expired." Id. at *2. Specifically, Zenith alleged that it "began seeking a supplier of bulk cefaclor in 1992 so that it could market generic cefaclor in the United States upon expiration of Lilly's patents." *Id.* (citation omitted). Because of Lilly's agreements with its "outsourcing" companies, however, none of those companies except for one were willing to sell Zenith bulk cefaclor--but the FDA did not approve that company's Abbreviated Antibiotic Drug Application ("AADA") until nearly one year after another "outsourcing" company's AADA was approved. *Id.* (citation omitted).

The court denied Lilly's motion to dismiss:

> Lilly argues that Zenith's assertion that Dobfar would have sold it bulk cefaclor, thus enabling it to enter the generic cefaclor market earlier, is "sheer

Not Reported in F.Supp.2d                                           Page 11
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
**(Cite as: 2002 WL 31059289 (S.D.N.Y.))**

speculation," and notes that Zenith
*12 does not allege that it would have used Dobfar, rather than Opus, as a bulk cefaclor supplier but for Dobfar's decision ... does not allege that, had Dobfar or Ranbaxy been willing to supply bulk cefaclor to Zenith, Zenith's choice of supplier would have been any differen[t] ... [and does not allege] that it preferred Dobfar to Opus, whether on the basis of price, quality, availability of bulk cefaclor, or any other basis.

Lilly's Reply Brief at 5. This is all true; however, Zenith's counterclaim need not contain such extensive allegations. Rather, the question is whether Zenith can prove any set of facts, consistent with its counterclaim, that would entitle it to relief. *See Sanjuan [v. Am. Bd. of Psychiatry & Neurology], 40 F.3d [247,] 251* [ (7th Cir.1995) ] (citation omitted) ("At this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.") It is not outside the realm of possibility that Zenith will be able to prove that but for Lilly's agreement with Dobfar, Zenith would have purchased bulk cefaclor from Dobfar rather than Opos and would have entered the U.S. generic cefaclor market sooner than late April 1995....

Lilly finally argues that any delay in Zenith's entry into the generic cefaclor market was proximately caused by the slow FDA approval process, not by any action of Lilly; in other words, but for the time it took the FDA to approve Opos's and Zenith's AADAs, Zenith would have been able to enter the U.S. cefaclor market when Lilly's patent expired. However, Dobfar's AADA to sell bulk cefaclor was approved in April 1994, and Zenith may be able to prove that its AADA more likely than not would have been approved sooner had its application sought to use Dobfar's bulk cefaclor, rather than Opos's, to produce its generic cefaclor. There is, then, at least one set of facts which, if proved, will demonstrate that Zenith was injured by Lilly's alleged actions. The allegations contained in Zenith's amended counterclaim are not inconsistent with that set of facts; therefore, Zenith has not pled itself out of court, and Lilly's motion to dismiss on that ground must be denied.

*Id.* at *4–*5; *see also, e.g., Italian & French Wine Co. v. Negociants U.S.A., Inc., 842 F.Supp. 693 (W.D.N.Y.1993)* (denying motion to dismiss unjust enrichment claim; plaintiff contended that, "as a result of [defendant's] acts in wrongfully interfering with Plaintiff's contractual relations with Negociants, Lauber was unjustly enriched by virtue of the profits accruing to Lauber which, but for Lauber's activities, would have accrued to Plaintiff"). [FN9]

FN9. Because I find that DRL has sufficiently pled injury, I need not address the parties' arguments with respect to whether the North Carolina Trade Secrets Act specifically requires DRL to plead injury.

### B. *Noerr-Pennington Immunity*

Finally, aaiPharma invokes the *Noerr-Pennington* doctrine as a defense to DRL's allegations that, after aaiPharma obtained a shipment of bulk omeprazole products from DRL: (1) aaiPharma tested the bulk product to find ways to keep DRL's generic bulk omeprazole product off the market, in violation of the parties' agreement; (2) aaiPharma shared the results of that testing with AstraZeneca to delay the approval of DRL's own product; (3) AstraZeneca reported data reflecting the results of that testing with the FDA, contenting that DRL's bulk was not bioequivalent to Prilosec; and (4) in response to AstraZeneca's submission of this data, "the FDA has requested that DRL run tests costing hundreds of thousands of dollars, delaying DRL's approval and adversely impacting DRL's entitlement to Hatch-Waxman exclusivity." (Am.Compl.¶ ¶ 16, 21-22, 25-26, 34-36). According to aaiPharma, "[t]he only way aaiPharma's (and/or Astra[Zeneca]'s) purported conduct could have caused such a delay was by petitioning the FDA (a governmental agency) and informing the agency of information relating to omeprazole. Even if true, such a petition to the FDA triggers the *Noerr-Pennington* doctrine and is immune from liability." (aaiPharma's Mem. Supp. Mot. Dismiss All Claims at 13).

*13 The *Noerr-Pennington* doctrine provides immunity from liability for conduct seeking to influence government action. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc .., 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657, 669-70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).* The immunity extends to persons who petition all types of government entities, including administrative agencies. *California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).* While *Noerr-Pennington* has traditionally applied to antitrust claims, courts have expanded use of the doctrine to encompass state law tort claims that arise from government action. *See, e.g., Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc., 268 A.D.2d 101, 707 N.Y.S.2d 647, 652 (App.Div.2d Dept.2000)*

Not Reported in F.Supp.2d                                    Page 12
Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878
**(Cite as: 2002 WL 31059289 (S.D.N.Y.))**

("Although the *Noerr-Pennington* doctrine initially arose in the antitrust field, the courts have expanded it to protect First Amendment petitioning of the government from claims brought under Federal and State law, including claims asserted pursuant to ... common-law tortious interference with contractual relations."); *Bristol-Myers Squibb Co. v. Ivax Corp., 77 F.Supp.2d 606, 616 (D.N.J.2000)* (unfair competition claim); *Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 128-29 (3d Cir.1999)* (tortious interference and unfair competition claims); *Fox News Network, L.L.C. v. Time Warner Inc., 962 F.Supp. 339, 345 (E.D.N.Y.1997)* ("The [*Noerr-Pennington* ] doctrine originated as a limit on antitrust liability, but has been used to prohibit other types of proceedings, including civil rights actions and tortious interference claims.").

[4] aaiPharma is not entitled to *Noerr-Pennington* immunity. While DRL alleges that aaiPharma conspired with AstraZeneca to share the results of aaiPharma's bulk omeprazole testing, AstraZeneca was the one that actually reported data to the FDA reflecting the results of that testing. Therefore, as DRL states, "even if the petitioning fell within *Noerr-Pennington* immunity it was Astra--not aaiPharma-- which engaged in and would arguably be protected by the petitioning immunity." (DRL's Mem. Opp. aaiPharma's Mot. Dismiss at 20).

aaiPharma attempts to evade this reality by grouping together its alleged activities with AstraZeneca's alleged activities and characterizing them as, in essence, a joint petition. (*See* aaiPharma's Mem. Supp. Mot. Dismiss All Claims at 13 ("The only way aaiPharma's (and/or Astra's) purported conduct could have caused such a delay was by petitioning the FDA (a governmental agency) and informing the agency of information relating to omeprazole."); *id* . ("All of DRL's allegations regarding aaiPharma's (and/or Astra's) efforts before the FDA are immune from scrutiny pursuant to the *Noerr-Pennington* doctrine and cannot support the unfair or deceptive acts or practices claims."); aaiPharma's Reply Mem. Supp. Mot. Dismiss All Claims at 15 (describing its own alleged misconduct as "providing information to the FDA through Astra-Zeneca")). But DRL has only alleged that AstraZeneca was the petitioning party here, not aaiPharma. aaiPharma's characterizations cannot change the pleadings.

### CONCLUSION

*14 aaiPharma's motion to dismiss the amended complaint is denied. Counsel for all parties shall appear at a status conference on October 18, 2002, at 9:00 a.m., Courtroom 12A, United States District Court, Southern District of New York, 500 Pearl Street, New York, New York.

SO ORDERED:

Not Reported in F.Supp.2d, 2002 WL 31059289 (S.D.N.Y.), 66 U.S.P.Q.2d 1878

**Motions, Pleadings and Filings (Back to top)**

•                1:01cv10102                (Docket) (Nov. 14, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Mylan Pharmaceuticals Inc. v. Merck & Co., Inc.*,
no. 05-cv-1416 (M.D. Pa.)  (Judge Sylvia H. Rambo)

# Appendix Exhibit B

*Ivoclar Vivadent, Inc. v. Hasel,*
*No. 02-CV-0316E(F), 2003 WL 21730520*
*(W.D.N.Y. June 30, 2003)*

Not Reported in F.Supp.2d

Page 1

2003 WL 21730520 (W.D.N.Y.)

**(Cite as: 2003 WL 21730520 (W.D.N.Y.))**

**c**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.

IVOCLAR VIVADENT, INC., Plaintiff,
v.
Dr. Robert W. HASEL and ABCO Research, LLC.,
Defendants.

No. 02-CV-0316E(F).

June 30, 2003.

Competitor brought action against patent holder seeking declaration that certain patents owned by patent holder were invalid and unenforceable. On patent holder's motion to dismiss for lack of personal jurisdiction, or to transfer action to another district, the District Court, Elfvin, J., held that: (1) court had personal jurisdiction over patent holder who was located in Minnesota, and (2) competitor had reasonable apprehension of imminent patent infringement suit by patent holder.

Motions granted in part and denied in part.

West Headnotes

**[1] Federal Courts** ⟨⟩⟩⟩76.35
170Bk76.35 Most Cited Cases

Court had personal jurisdiction over patent holder who was located in Minnesota, in action brought by competitor in New York seeking declaration that certain patents owned by patent holder were invalid and unenforceable; although patent holder did not have any offices, employees, assets, or telephone listings in New York, it was extensively engaged in enforcing and licensing its patents in New York, which was its primary business activity. 28 U.S.C.A. § 2201; Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.; McKinney's CPLR §§ 301, 302(a)(1).

**[2] Declaratory Judgment** ⟨⟩⟩⟩234
118Ak234 Most Cited Cases

Competitor had reasonable apprehension of imminent patent infringement suit by patent holder, and, therefore, court had subject matter jurisdiction for competitor to seek declaration that certain patents owned by patent holder were invalid and unenforceable; although parties had entered into

negotiations regarding possible patent license, patent holder communicated implicit threats of litigation to competitor by telling competitor that it pursued patent infringement litigation against another alleged infringer, which terminated favorably to patent holder, and that it would be enforcing its patents against other infringers. 28 U.S.C.A. § 2201.

**[3] Federal Civil Procedure** ⟨⟩⟩⟩1832
170Ak1832 Most Cited Cases

In deciding a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidence outside the pleadings. Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.

**Patents** ⟨⟩⟩⟩328(2)
291k328(2) Most Cited Cases

5,547,379, 5,944,527, 6,315,567. Cited.

MEMORANDUM and ORDER [FN1]

> FN1. This decision may be cited in whole or in any part.

ELFVIN, J.

*1 Plaintiff Ivoclar Vivadent, Inc. ("Ivoclar") commenced this action April 26, 2002, pursuant to 28 U.S.C. § 2201(a), seeking a declaration that certain patents owned by defendants Dr. Robert W. Hasel and ABCO Research, LLC ("ABCO") are invalid and unenforceable. Defendants now move to dismiss the Complaint pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure ("FRCvP") [FN2] on the grounds that this Court lacks personal and subject matter jurisdiction. In the alternative, defendants request that this Court exercise its discretion pursuant to 28 U.S.C. § 1404(a) and transfer this action to the United States District Court for the District of Minnesota. For the reasons stated hereinbelow, defendants' motion to dismiss will be denied and its request to transfer venue will be granted.

> FN2. Although defendants have erroneously cited FRCvP 12(b)(6) as the basis for its motion to dismiss for lack of subject matter jurisdiction, the Court will treat such as a motion to dismiss pursuant to FRCvP 12(b)(1).

The following facts are undisputed unless otherwise noted. Hasel, a resident of the State of Minnesota, is the inventor of U.S. Patent Nos. 5,547,379 ("the '379 patent"), 5,944,527 ("the '527 patent") and 6,315,567 ("the ' 567 patent") - each

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

entitled "Method of Restoring a Tooth." Hasel and Andrew Grossman are co-owners of ABCO, a Minnesota corporation whose function is to manage the prosecution and licensure of Hasel's patents. Hasel Decl. ¶ 5. Hasel assigned the rights to the three patents to ABCO. Ivoclar is a manufacturer of dental materials with its principal place of business in the Town of Amherst, N.Y.

On January 26, 2000 Grossman sent a letter to Robert A. Ganley, Ivoclar's Chairman of the Board, indicating that several of its marketed dental products infringed one or more of ABCO's patents and concluded with an offer for a license. [FN3] Hasel Decl. ABCO's counsel sent another letter to Ivoclar on December 4, 2001. The letter reads, in pertinent part:

> FN3. The pertinent text of the letter reads as follows:
> "This letter is to advise you, and to provide notice to you under 35 U.S.C. § 287, that Vivadent/Ivoclar North America, Inc.'s Tetric Flow, Heliomolar Flow and Compoglass Flow products and possibly other restorative products infringe one or more claims of U .S. Patent Nos. 5,547,379 and 5,944,527. A copy of each patent is enclosed.
> "ABCO Research, LLC would be pleased to provide Vivadent/Ivoclar North America, Inc. with a nonexclusive license under the patents (enclosed)." Hasel Decl., Annex.

"For nearly two years, ABCO and Dr. Hasel pursued patent infringement litigation against Kerr Corporation concerning Kerr's sales of its flowable composite, Revolution®. Last June, on the eve of trial, after completing all fact and expert discovery, dispositive motions and final pretrial procedures, Kerr agreed to settle the litigation on terms favorable to ABCO. Enclosed is a copy of the Consent Judgment entered by the Court in which Kerr stipulated that the '379 and '537 Patents are valid and enforceable and that Kerr's sales of its Revolution® product and their use constitute infringement of the '527 Patent. As part of the settlement and to allow it to continue to sell its Revolution® products, Kerr also agreed to an ongoing license and royalty arrangement with ABCO.

* * *

"Now that the litigation against Kerr has concluded and ABCO's patent portfolio has been strengthened by the issuance of the '567 Patent, ABCO will be enforcing these patents against other infringers.
"Please be advised that ABCO believes that Vivadent/Ivoclar's sales of flowable composite products may infringe one or more claims of the '379 Patent, the '527 Patent, and/or '567 Patent." Compl., Ex. A.

*2 Based on these two letters, plaintiff filed its Complaint seeking a declaratory judgment of non-infringement. In moving to dismiss pursuant to FRCvP 12(b)(2), defendants initially argued that the sending of those two letters was insufficient to subject them to the personal jurisdiction of this Court. In response, plaintiff has offered evidence of defendants' other activities in New York.

ABCO sent seven letters to Harry Schein, Inc. ("Schein") - one of Ivoclar's distributors whose headquarters are located in Melville, N.Y. - between June 20, 2001 and November 16, 2001, regarding Schein's alleged infringement of ABCO's patents and a possible licensing agreement. The first such letter, dated June 20, 2001, contained virtually identical warnings and allegations as the subsequent December 4, 2001 letter sent to Ivoclar and also specified various products, including two of Ivoclar's - viz., the Heliomolar® Flow and the Tetric® Flow -, that ABCO believed "may infringe one or more of the claims of the '527 Patent, and, depending on their chemical makeup, perhaps the ' 379 Patent as well." Decl. of Alan S. Korman, Esq., Ex. B. Plaintiff also asserts that defendants met with Schein, on or about July 23, 2001, at Schein's offices in Melville to discuss ABCO's claims of infringement and a possible licensing agreement. [FN4] Korman Decl. ¶ 12. At the meeting, ABCO allegedly "informed Schein that [it] planned to file a patent infringement lawsuit against dental manufacturers, including Ivoclar." Id. ¶ 16. Ivoclar subsequently sent Schein a November 2, 2001 letter by which it indicated that ABCO had "elected to proceed to actively enforce their patents directly against manufacturers of flowable composites other than Kerr, including manufacturers who sell their flowable composites through Harry Schein." [FN5] Id., Ex. G.

> FN4. Plaintiff alleges that defendants also met with Pentron Corporation - another dental manufacturer that had been accused of patent infringement by defendants - on January 25, 2002 in New York City, to discuss the terms of a possible license agreement between the two parties. Korman Decl. ¶ 18.

> FN5. Plaintiff claims that defendants filed separate lawsuits, on or about November 2, 2001, against two such manufacturers - to wit, Danville Manufacturing, Inc. and Pulpdent Corporation - in the United States District Court for the District of Minnesota. Korman Decl. ¶ 17.

Not Reported in F.Supp.2d                                                          Page 3
2003 WL 21730520 (W.D.N.Y.)
(Cite as: 2003 WL 21730520 (W.D.N.Y.))

Korman also alleges that ABCO's counsel called him several times between February and March of 2002 and offered to meet with him in New York City, or elsewhere, to discuss settlement of defendants' infringement claims against Ivoclar. The parties agreed to meet, in Chicago, Ill. on April 29, 2002. Ivoclar then commenced this action by filing its complaint with this Court on April 26, 2002. Three days later, on April 29, 2002, Korman met with Grossman and ABCO's attorney, Harry Manbeck, Jr., Esq., in Chicago to discuss settlement of the patent infringement claims. The tone and content of that meeting has been vigorously debated by its participants. Manbeck and Grossman describe the meeting as "cordial" during which Korman had indicated his belief that Ivoclar's products did not infringe ABCO's patents and that such patents may be invalid. When asked to provide information supporting his position, Korman indicated to them that he would have to speak with his associates and get back to them. Manbeck and Grossman also assert that Korman told them that he had filed the April 26, 2002 Complaint but that "he would hold off on serving [it] pending further discussions with us." Grossman Decl. ¶ 3; *see also* Manbeck Decl. ¶ 8 ("During the meeting, Mr. Korman mentioned that he had filed the complaint in this action the previous Friday, April 26. However, he also said that he would hold off on serving the complaint pending further discussions with us."). Both Grossman and Manbeck assert that they were both led to believe that further discussions with Korman would follow, pending Korman's attempts to obtain the relevant information. Manbeck then spoke with Korman on June 13, 2002 during which conversation Korman told Manbeck that his European associates were finalizing their position and had been providing him with information for his review and that he would call Manbeck the following Monday, June 17. Manbeck asserts that Korman did not call on June 17 and that he has had no further contact with Korman since that time. Grossman also claims that he had no further contact with Korman after the April 29, 2002 meeting. Plaintiff served defendants with its Complaint on August 14, 2002.

*3 Korman's version of events regarding the April 29, 2002 meeting is much different from that of defendants. Korman disputes defendants' contention that the meeting "was part of ongoing settlement discussions which provided a reasonable probability of producing a non-judicial resolution of [the] dispute." Korman Sur-Reply Decl. ¶ 2. Korman alleges that, by April 26, 2002, prospects for settlement "were very slim" and that, although there had been no apparent change in either party's position before the April 29, 2002 meeting, he "planned to go ahead with the meeting so long as any hope remained * * *." *Id.* ¶ 3. Korman further states that he "did not expect the discussions to result in a settlement and [he] did not provide either Mr.

Manbeck or Mr. Grossman *any* basis from which a reasonable person could conclude that settlement was more than an improbable possibility" and that he "went ahead with the meeting with very low expectations for a settlement." *Ibid.* Thus, Korman concludes that Ivoclar "had a reasonable apprehension of being sued for patent infringement based on defendants' threats and their actual litigation against other companies." *Ibid.*

[1] Defendants' first argument in support of its motion to dismiss is that this Court lacks personal jurisdiction over them. They argue that both defendants are "located in Minnesota" and are "neither authorized nor licensed to do business in New York, nor do they have offices, employees, assets, or telephone listings in this state." Defendants further maintain that the two letters sent to plaintiff - dated January 26, 2000 and December 4, 2001 - are insufficient to subject them to this Court's personal jurisdiction.

Plaintiff points to the nature of defendants' business - *viz.*, licensing and enforcing patents - and, for purposes of establishing personal jurisdiction under New York's Civil Practice Law and Rules ("CPLR") § 301, contends that they are "doing business" in New York. Additionally, plaintiff argues that defendants are subject to this Court's personal jurisdiction pursuant to CPLR § 302(a)(1) - New York's long-arm statute - because their New York activities qualify as a transaction of business as provided for by the statute.

In opposition to defendants' motion to dismiss, plaintiff need make only a prima facie showing of personal jurisdiction in accordance with New York law. *See Graphic Controls Corp. v. Utah Medical Products, Inc.*, 1997 WL 276232, at *2 (W.D.N.Y.1997) (applying New York law in determining whether the court had personal jurisdiction over the foreign defendant), *aff'd*, 149 F.3d 1382 (Fed.Cir.1998); *Capitol Records, Inc. v. Optical Recording Corp.*, 810 F.Supp. 1350, 1352 (S.D.N.Y.1992) (applying New York law and holding that the plaintiff needs only make a prima facie showing of personal jurisdiction in opposition to foreign defendant's FRCvP 12(b)(2) motion). In determining the disposition of a FRCvP 12(b)(2) motion, the court may consider facts as presented in evidentiary material outside the pleadings. *Teachers' Retirement Sys. of LA v. A.C.L.N., Ltd.*, 2003 WL 21058090, at *7 (S.D.N.Y.2003). Such material is construed in the light most favorable to, and any doubts are resolved in favor of, the plaintiff. *Ibid.; Graphic Controls*, at *2.

*4 CPLR § 301 provides for jurisdiction over a foreign corporation if it "does business in New York, not occasionally or casually, but regularly, continuously and systematically thereby demonstrating a sufficiently fair

Not Reported in F.Supp.2d                                                                  Page 4
2003 WL 21730520 (W.D.N.Y.)
**(Cite as: 2003 WL 21730520 (W.D.N.Y.))**

measure of permanence to warrant a finding of the corporation's constructive presence here." *Graphic Controls,* at *2. This so-called "doing business" test requires a court to analyze the specific facts of each individual case to determine whether a foreign corporation's contacts and connections with New York demonstrate continuous and systematic activity. *Ibid.* (citing *Landoil Resources v. Alexander & Alexander Serv.,* 918 F.2d 1039, 1043 (2d Cir.1990)). Finally, unlike New York's long-arm statute, a jurisdictional inquiry under CPLR § 301 does not require that the plaintiff's cause of action "emanate from or have any nexus to the defendant's business activity." *Ibid.*

Defendants' activities in New York are substantial and sufficiently continuous to support the exercise of personal jurisdiction over them under CPLR § 301. Initially, it is important to note that ABCO's sole function is to manage, enforce and license its patents and that it lacks the "traditional indicia of doing business because it does not manufacture or sell tangible goods." *Capitol Records,* at 1353. Accordingly, the frequency and nature of ABCO's New York business activities must be analyzed within such a context in determining whether such contacts demonstrate the requisite degree of permanence. *See Capitol Records,* at 1353 (noting that, for the purposes of establishing personal jurisdiction, a company's business activities conducted in New York must not be peripheral to its "main business" but must be a substantial part of that corporation's business). ABCO sent at least ten letters, between January 26, 2000 and December 4, 2001, to three different companies that related to its efforts to enforce and license its patents. [FN6] In addition, ABCO's counsel made numerous phone calls to plaintiff during which ABCO had offered to meet with Ivoclar in New York to negotiate a possible license, solicited licensing fees and reiterated its infringement claims. Korman Decl. ¶ 9. ABCO also traveled to New York twice to meet with Schein and Pentron Corp. to discuss possible licensing agreements. Defendants do not dispute that they engaged in such activities and, while the Court recognizes that, without more, the two letters that ABCO had sent to Ivoclar would be insufficient for this Court to exercise jurisdiction over defendants - *see Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.,* 148 F.3d 1355, 1360-1361 (Fed.Cir.1998) (finding that three cease-and-desist letters did not confer personal jurisdiction over a foreign defendant) -, defendants' other activities in not only protecting its patents but soliciting licensing fees in New York, when combined with their two "cease and desist" letters, evince the requisite permanence - i.e., systemic and continuous activity - to satisfy New York's "doing business" test. Thus, although ABCO has no offices, employees, assets or telephone listings in New York, it is subject to the personal jurisdiction of this Court because it

has extensively engaged in its primary business activity - to wit, enforcing and licensing its patents - in New York. Accordingly, defendants' motion to dismiss for lack of personal jurisdiction will be denied. [FN7]

> FN6. Such letters comprised the two "cease and desist" letters to Ivoclar, a virtually identical one sent to Heraeus Kulzer, Inc. and the previously discussed seven letters that had been sent to Schein.

> FN7. The Court will decline to address whether ABCO is subject to personal jurisdiction under CPLR § 302 inasmuch as the issue is moot.

*5 [2] The Court next addresses defendants' motion to dismiss based on its argument that there was no actual controversy at the time plaintiff filed its complaint and that this Court therefore lacks subject matter jurisdiction over this case.

Section 2201(a) of the Declaratory Judgment Act authorizes a court to declare the rights of an interested party in a case of actual controversy. 28 U.S.C. § 2201. The purpose of the Act "is to protect threatened parties from the uncertainty and anxiety resulting from a looming lawsuit." *Clay Paky, S.p.A. v. Vari-Lite, Inc.,* 2000 WL 977709, at *3 (S.D.N.Y.2000). However, a prerequisite to any claim brought pursuant to section 2201(a) is that an actual controversy must have existed at the time the complaint was filed. *Bausch & Lomb Inc. v. CIBA Corp.,* 39 F.Supp.2d 271, 273 (W.D.N.Y.1999); *see also R & P Pools, Inc. v. New Kayak Pool Corp.,* 2001 WL 135823, at *2 (W.D.N.Y.2001) ("[T]o proceed in the absence of a case or controversy would involve the court in rendering a forbidden advisory opinion.") (quotation and citation omitted). And, in a case such as this, plaintiff must demonstrate " '(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.' " [FN8] *R & P Pools,* at *2 (quoting *B.P. Chemicals, Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978) (Fed.Cir.1993). The plaintiff bears the burden of proving that there is an actual controversy. *Ibid.* Nonetheless, even if plaintiff shows that an actual controversy existed, the exercise of jurisdiction over this cause of action is not mandatory but within the "sound discretion of [this] court." *Ibid.*

> FN8. There is no issue for the Court regarding plaintiff's satisfaction of the second prong

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

inasmuch as it is undisputed that plaintiff has sold a product that allegedly infringes defendants' patents.

[3] Plaintiff contends that an actual controversy existed because it had a reasonable apprehension that ABCO would imminently file a patent infringement suit. The test for determining whether plaintiff's apprehension was reasonable is an objective one "which focuses on whether the defendant's conduct rose to a level sufficient to indicate an intent to enforce its patent." ' Clay Paky, at *4 (quoting Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 888 (Fed.Cir.1992)). In determining whether plaintiff has demonstrated the requisite reasonable apprehension, the Court must objectively consider the totality of the circumstances. [FN9] Ibid.

> FN9. In deciding defendants' motion to dismiss for lack of subject matter jurisdiction, this Court may consider evidence outside the pleadings. Indium Corp. of America v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed.Cir.1985).

Plaintiff contends that the efforts put forth by ABCO in attempting to enforce and license its patents [FN10] created a situation where it was reasonable for Ivoclar to apprehend that ABCO was imminently close to filing a patent infringement action against it. Plaintiff places particular significance on the threatening language contained within ABCO's December 4, 2001 letter by which ABCO had (1) alleged that Ivoclar's products may have infringed its patents, (2) informed Ivoclar that it had obtained a Consent Judgment in its patent infringement action against Kerr corporation, (3) informed Ivoclar that it "will be enforcing [its] patents against other infringers" and (4) invited Ivoclar to negotiate a license. See Compl., Ex. A.

> FN10. Conduct which included the two letters sent to Ivoclar, the various phone conversations between counsel for Ivoclar and ABCO, the seven letters sent to Schein and the commencement of three separate lawsuits against other alleged infringers - to wit, Kerr Corporation, Pulpdent Corporation and Danville Manufacturing, Inc.

*6 Defendants counter that no actual controversy existed at the time plaintiff filed its Complaint because the parties were still conducting settlement negotiations with regard to the alleged patent infringement. In support, defendants direct the Court to the fact that Ivoclar had commenced this action on April 26, 2002 - three days before the parties' April 29, 2002 settlement conference in Chicago - and that Korman had subsequently agreed at the conclusion of such meeting to refrain from serving the Complaint pending

further discussions. Defendants argue that such facts refute plaintiff's contention that it reasonably believed that it was facing an imminent patent infringement lawsuit and, further, that to allow plaintiff to utilize its premature complaint as a negotiating tool during ongoing negotiations would defeat the purpose of the Declaratory Judgment Act.

Plaintiff has shown that it was objectively reasonable for it to apprehend that it was the target of an imminent patent infringement lawsuit by ABCO. Defendants' December 4, 2001 letter warned Ivoclar that (1) several of its marketed products "may infringe" ABCO patents, (2) ABCO had pursued patent infringement litigation for nearly two years against another alleged infringer, Kerr Corporation, resulting in a settlement with "terms favorable to ABCO" and (3) it "will be enforcing [its] patents against other infringers." Such warnings, in effect, were "a statement to the plaintiff to take notice that it is next on the list." Clay Paky, at *4 (quotations and citations omitted). [FN11] In other words, it was reasonable for Ivoclar to interpret the letter as a threat from ABCO by which ABCO was saying to Ivoclar, "If you don't think we mean business and are serious about this matter, look and see what we have done to another alleged infringer," Kerr Corporation. Ibid. (quotation and citation omitted). In addition to such implicit threats of litigation, defendants' other conduct - to wit, commencing litigation against other alleged infringers and indicating to Schein that it had "elected to proceed to actively enforce their patents directly against manufacturers of flowable composites other than Kerr, including manufacturers who sell their flowable composites through Harry Schein" [FN12] - contributed to an environment or, more appropriately, adverse circumstances whereby it would have been reasonable for Ivoclar to apprehend that ABCO was about to commence a patent infringement action against it.

> FN11. See also Clay-Paky, at *4 (finding that a letter, similar to the one here that was sent by ABCO, - by which the defendant had warned the declaratory plaintiff that (1) it had aggressively enforced its patent rights against a named third-party, (2) plaintiff's product "may infringe" the defendant's patent, (3) plaintiff should "cease and desist" from selling its product and (4) if plaintiff chose to continue selling its product to contact the defendant in order to discuss a license - was one that "clearly threatened litigation").

> FN12. Korman Decl., Ex. G.

Defendants argue however that the holding in Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d 1051 (Fed.Cir.1995), lends support for its motion to dismiss.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                        Page 6
2003 WL 21730520 (W.D.N.Y.)
**(Cite as: 2003 WL 21730520 (W.D.N.Y.))**

In *Phillips Plastics,* the Federal Circuit Court of Appeals held that the defendant's conduct in merely attempting to conduct license negotiations did not create a justiciable controversy. Significantly, the Court held that, "the offer of a patent license does not create an actual controversy" and that "when there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down." *Phillips Plastics,* at 1053. Seizing on such language, defendants argue that no justiciable controversy existed in this case because plaintiff filed its Complaint three days before a scheduled meeting where the parties were supposed to discuss a licensing agreement. Defendants' reliance on *Phillips Plastics* is misplaced because therein the patentee had merely invited license negotiations and had neither "stated nor suggested that it would pursue legal recourse if it were not satisfied with the outcome of the proposed licensing negotiations." *Clay-Paky,* at *5; *see also* Conmed Corp. v. ERBE Electromedizin GMBH, 129 F.Supp.2d 461, 466 (N.D.N.Y.2001) (distinguishing *Phillips Plastics* based on the same premise); EMC Corp. v. Norand Corp., 89 F.3d 807, 812 (Fed.Cir.1996) (distinguishing *Phillips Plastics* as a case where all that was present was "negotiation unaccompanied by threats of legal action"). Here, in contrast, ABCO communicated implicit threats of litigation, which created a situation whereby it was reasonable for Ivoclar to apprehend the imminent commencement of a patent infringement action. As explained by the *Clay Paky* court, defendants' oblique accusations of patent infringement and "thinly veiled threats of resorting to litigation" render the present case inapposite to that of *Phillips Plastics. Clay-Paky,* at *5. Furthermore, the fact that the parties had entered into negotiations regarding a possible patent license does not necessarily mean that ABCO's reasonable apprehension of litigation had necessarily been removed. *See ibid.* ("Just because the parties proceeded to initiate negotiations does not mean that the reasonable apprehension of litigation was ever removed."). Thus, the fact that the parties may have been negotiating a possible patent license is not dispositive, but merely a factor that is, in this case, insufficient to overcome defendants' other threatening conduct that gave rise to Ivoclar's reasonable apprehension of an imminent patent infringement suit by ABCO.

*7 Having found that the Court has both personal jurisdiction over the defendants and subject matter jurisdiction over this case, the Court must finally determine whether to exercise jurisdiction in this case. *See EMC Corp.,* at 810 ("Even if there is an actual controversy, the district court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction.") (citing Public Serv. Comm'n v. Wycoff Co.,

344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). However, the issue has become moot and the Court will decline to exercise jurisdiction in this case because plaintiff has now joined in defendants' request to transfer venue, pursuant to 28 U.S.C. § 1404(a), from the Western District of New York to the District of Minnesota. [FN13] Therefore, rather than exercise jurisdiction in this matter, the Court will transfer this case to the District of Minnesota inasmuch as both parties have indicated that such Court is a mutually preferable and convenient forum.

> FN13. Plaintiff and defendants have submitted a Stipulation and Order dated June 27, 2003 by which they have agreed to transfer this action to the United States District Court for the District of Minnesota provided that this Court finds an actual case or controversy.

Accordingly, it is hereby *ORDERED* that defendants' motion to dismiss is denied in its entirety, that defendants' motion to transfer venue is granted and that the Clerk of this Court is directed to transfer this case to the United States District Court for the District of Minnesota.

2003 WL 21730520 (W.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

• 1:02CV00316 (Docket) (Apr. 26, 2002)

END OF DOCUMENT

*Mylan Pharmaceuticals Inc. v. Merck & Co., Inc.*,
no. 05-cv-1416 (M.D. Pa.)  (Judge Sylvia H. Rambo)

# Appendix Exhibit C

# *Clontech Laboratories, Inc. v. Life Technologies, Inc., No. Civ.A. AW-00-1879, 2000 WL 33124811 (D. Md. Dec. 20, 2000)*

Westlaw.

2000 WL 33124811                                                    Page 1
2000 WL 33124811 (D.Md.)
**(Cite as: 2000 WL 33124811 (D.Md.))**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Maryland, Southern
Division.

CLONTECH LABORATORIES, INC., Plaintiff,
v.
LIFE TECHNOLOGIES, INC., Defendant.

**No. Civ.A. AW-00-1879.**

Dec. 20, 2000.

*MEMORANDUM OPINION*

WILLIAMS, J.

**\*1** Currently pending before the Court is
Defendant's Motion to Dismiss Plaintiff's Action for
Declaratory Relief for lack of subject matter
jurisdiction under Fed.R.Civ.P. 12(b)(1) [6-1]. This
case involves United States Patent Number
6,063,608 ("the '608 patent") owned by Life
Technologies, Inc. ("LTI"). On June 22, 2000,
Clontech Laboratories, Inc. ("Clontech"), the
defendant in a concurrent action between the
parties, filed an action seeking a declaratory
judgment on the invalidity, unenforceability, and
noninfringement of the '608 patent pursuant to 28
U.S.C. § 2201. LTI, the patentee, asserts that
Clontech's complaint fails to allege the
jurisdictional prerequisites for seeking declaratory
relief. The motion has been fully briefed by both
parties. No hearing is deemed necessary. *See* Local
Rule 105.6. Upon consideration of the arguments
made in support of, and opposition to, the
Defendant's motion, the Court makes the following
determinations.

I. *FACTUAL BACKGROUND*

On May 16, 2000, the Patent and Trademark Office
issued United States Patent Number 6,063,608
entitled, "Cloned Genes Encoding Reverse
Transcriptase Lacking in RNase Activity" ("the '608
patent") to LTI. The '608 patent covers certain
biotechnology involved in the production of cDNA
libraries, gene clones, and other genomics
applications, in particular modified reverse
transcriptases having reduced levels of RNase H
activity. In a companion case involving the same
parties, LTI filed a patent infringement action
against Clontech based upon two other patents,
United States Patent Numbers 5, 244, 797 ("the
'797 patent") and 5, 668, 005 ("the '005 patent").
*Life Technologies, Inc. v. Clontech Laboratories,
Inc.,* No. AW-96-4080. In that case which is
currently pending before this Court, LTI alleged
that Clontech infringed the '797 and '005 patents by
incorporating LTI's Superscript TM and Superscript
TM II RNase H-minus reverse transcriptase
enzymes into Clontech products. The '797 and '005
patents describe and claim certain mutant reverse
transcriptase enzymes that have DNA polymerase
activity and substantially no RNase H activity. The
'608 patent was derived from the continuation
application of the patent applications leading to the
'797 and '005 patents.

Since the issuance of the '608 patent and six days
after Clontech filed this declaratory judgment
action, LTI filed an actions in the District Courts of
Delaware and Wisconsin against two other
companies, Promega and Stratagene, for infringing
on the '608 patent. In the past, LTI had sued these
same two defendants in this Court for infringing the
'797 and '005 patents. LTI did not join Clontech to
the subsequent litigation.

II. *DISCUSSION*

This Court's jurisdiction under the Declaratory
Judgment Act is limited to adjudicating actual cases
or controversies. The often quoted test for
evaluating whether a justiciable controversy exists
in the context of a declaratory judgment action
requires the following:

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2000 WL 33124811
2000 WL 33124811 (D.Md.)
**(Cite as: 2000 WL 33124811 (D.Md.))**

**\*2** First, the defendant's conduct must have created on the part of plaintiff a reasonable apprehension that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity. Second, the plaintiff must actually have either produced the device or have prepared to produce that device. The test, however stated, is objective and is applied to the facts existing when the complaint is filed. Its first prong looks to defendant's conduct; its second to that of plaintiff. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1988) (quoting *Goodyear Tire & Rubber v. Releasomers,* 824 F.2d 953, 955 (Fed.Cir.1987)) (citations omitted).

A. *Reasonable Apprehension of Impending Litigation*

To meet its burden of demonstrating that an actual controversy exists, a plaintiff must show that it reasonably apprehended that it was going to be sued by the defendant presently before the court. There is no allegation that LTI directly threatened Clontech with litigation over the '608 patent. However, such explicit threats are not necessary to support a declaratory judgment action. *Arrowhead Indus. Water, Inc.,* 846 F.2d at 736. In the absence of direct threats to sue, the court considers the "totality of the circumstances" in assessing whether the patentee's conduct objectively manifested an intent to sue the declaratory plaintiff. *See, e.g., Arrowhead Indus. Water, Inc.,* 846 F.2d at 736. LTI argues that Clontech has not alleged affirmative acts by LTI that could give rise to a reasonable apprehension that it will face an infringement action based upon the '608 patent. Referring to LTI's patents as the "RT Patent Family," Clontech argues that the '608 patent generally covers that same technology embodied in the previously litigated patents. Therefore, according to Clontech, LTI's current suit against Clontech for infringing the '797 and '005 patents manifests LTI's clear intent to pursue litigation on the newest addition to "LTI's RT Patent Family," the '608 patent.

"[A] clear history of adverse legal interests as shown by ongoing ... court action .... [i]s sufficient to give ... an objective inference of an impending infringement suit [after] the patents have [been] issued." *Goodyear Tire & Rubber v. Releasomers,* 824 F.2d 953, 955 (Fed.Cir.1987). In *Goodyear*

*Tire & Rubber,* the parties to the declaratory judgment action were "embroiled in a protracted dispute ... over commercial technology generally covered by [the recently issued patents in the declaratory judgment action]." 824 F.2d at 953. Given the history of litigation between the parties on similar patents and the substantial damages sought by the declaratory judgment defendant in the previous litigation, the Federal Circuit reversed the district court's dismissal of the declaratory judgment action for lack of subject matter jurisdiction. *Id.*

The key facts of *Goodyear Tire & Rubber* are sufficiently similar to the present action to warrant application. LTI does not dispute that, similar to the '005 and '797 patents, the newly issued '608 patent also covers technology involving modified reverse transcriptase enzymes. LTI has vigorously prosecuted its rights on those patents against Clontech and two other defendants over the past six years, clearly indicating that LTI "considers the disputed technology to be valuable." *Accord Goodyear Tire & Rubber,* 824 F.2d at 953. Furthermore, while not conclusive, "a patent owner's willingness and capacity to enforce its patent rights is pertinent to the inquiry for an actual controversy." *West Interactive Corp. v. First Data Resources,* 972 F.2d 1295, 1298 (Fed.Cir.1992). In its other infringement suit against Clontech, LTI added a claim for infringement of the '005 patent soon after its issuance. In its press release on the '608 patent, LTI stated that, in face of this Court's previous adverse rulings on the '797 and '005 patents, the '608 patent "re-establishes our proprietary position with respect to reverse transcriptases having reduced RNase H Activity and their use in all aspects of cDNA synthesis." (Pl. Opp'n Ex. 1). Viewed as a whole, the Court finds that LTI's conduct was sufficient to give Clontech a reasonable apprehension that LTI intends to similarly assert its perceived proprietary position in the marketplace and prosecute on the newly issued '608 patent. "The law does not require enterprises to keep their heads in the sand while a patentee picks them off one by one and at its leisure." *Arrowhead Indus. Water, Inc.,* 846 F.2d at 738. Hence, the Court holds that Clontech has satisfied the first prong of the analysis.

B. *Activity Exposing Declaratory Plaintiff to Litigation*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

**\*3** Clontech argues that, through the manufacture, marketing, and sale of its RNase H minus reverse transcriptase products, it faces exposure to an infringement action based upon the '608 patent. Specifically, Clontech contends that, given LTI's statement on the broad coverage of the '608 patent, its POWERSCRIPT TM product could arguably fall within the '608 patent's alleged coverage over modified reverse transcriptase genes having reduced levels of RNase H activity. Clontech currently markets its POWERSCRIPT TM product as a modified RNase H minus reverse transcriptase gene. Given that the parties' products arguably fall within similar areas of biotechnology concerning reverse transcriptase products and LTI's prior allegations that Clontech's products infringed its earlier patents, Clontech has established its manufacture, marketing, and sale of the POWERSCRIPT TM could reasonably subject it to an infringement action by LTI based on the '608 patent. As Clontech has established the second prong of the case or controversy requirement, this Court has discretion to exercise jurisdiction over Clontech's declaratory judgment action. Still, as the Federal Circuit succinctly stated in *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,*

> There is no absolute right to a declaratory judgment. The Act says a court "may" grant one. Hence, when there is a clear controversy and thus jurisdiction, a district court's decision on whether to exercise that jurisdiction is discretionary.

846 F.2d 731, 735 n. 6. For the reasons discussed below, the Court notes the existence of certain facts that implicate whether the assertion of jurisdiction is warranted.

C.   *Discretionary Authority over Declaratory Judgment Action*

"The reason for giving ... discretion to the district court is to enable the court to make a reasoned judgment whether the investment of judicial time and resources in a declaratory action will prove worthwhile in resolving a justiciable dispute." *Minnesota Min. and Mfg. Co. v. Norton,* 929 F.2d 670, 672 (Fed.Cir.1991).

> The relevant factors which the district court must consider include, but are not limited to: (1) whether there is a pending state action in which all of the matters in the controversy may be fully litigated; (2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant; (3) whether the plaintiff engaged in forum shopping in bringing the suit; (4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exists; (5) whether the federal court is a convenient forum for the parties and witnesses; and (6) whether retaining the lawsuit in federal court would serve the purposes of judicial economy.

*United National Ins. Co. v. Bradley's Elec. Inc.,* 35 U.S.P.Q.2d 1559, 1561-62 (S.D.Tex.1995).

The purpose of the Declaratory Judgment Act was to offer manufacturers a remedy for the "[g]uerrilla-like" tactics of patent owners that employed "extra-judicial patent enforcement with scare-the-customer-and-run tactics that infect[ed] the competitive environment of the business community with uncertainty and insecurity." *Arrowhead Indus. Water, Inc.,* 846 F.2d at 735. It is apparent from the pleadings that Clontech did not file this declaratory judgment action in order to resolve the uncertainty and insecurity arising from a looming threat of litigation. Rather, Clontech engaged in its own forum shopping to counteract LTI's future efforts to shop for another forum outside of this Court, as shown in the cases of Stratagene and Promega. "Unlike the other two defendants from LTI's first round of infringement suits, Clontech beat LTI to the punch by filing the instant action in this Court first, thereby defeating LTI's efforts to shop for a forum other than this Court." (Pl.'s Opp'n at 3). Clontech "beat LTI to the punch" by six days, as LTI filed its infringement suits against Strategene and Promega based on the '608 patent on June 29, 2000. " 'The manufacturer who is charged with infringing a patent cannot stretch the Federal Declaratory Judgments Act to give him a paramount right to choose the forum for trying out questions of infringement and validity." ' *Serco Services Co., L.P. v. Kelley Co., Inc.,* 31 U.S.P.Q.2d 1795, 1797-98 (N.D.Tex.1994) (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 185 (1952). Nevertheless, Clontech's statements and the temporal proximity between LTI's suit against the same two defendants previously sued along with Clontech in this Court indicate that both parties have engaged in forum shopping to achieve some perceived territorial advantage.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2000 WL 33124811                                                                    Page 4
2000 WL 33124811 (D.Md.)
(Cite as: 2000 WL 33124811 (D.Md.))

*4 Nonetheless, the Federal Circuit has stated the
mere filing of a subsequent infringement action
involving the same subject matter is not sufficient
grounds to warrant dismissal of the first-filed
action. *See Serco Services Co., L.P. v. Kelley Co.,
Inc.,* 51 F.3d 1037, 1039 (Fed.Cir.1995); *Genetech,
Inc. v. Eli Lilly & Co .,* 998 F.2d 931, 937-38
(Fed.Cir.1993). Here, there is no parallel
infringement action based upon the '608 patent
against *Clontech* rather LTI elected to sue only the
other two initial defendants. In addition, as stated
earlier, these two parties are already before this
Court on the patent infringement action involving
the '797 and '005 patents. *See Genetech,* 998 F.2d at
938. Consequently, the Court finds that the current
circumstances do not warrant declining jurisdiction
over Clontech's declaratory judgment action.
Therefore, for the reasons stated above, the Court
will deny Defendant's Motion to Dismiss for Lack
of Subject Matter Jurisdiction. An Order consistent
with this Opinion will follow.

### ORDER

For the reasons stated in the accompanying
Memorandum Opinion dated January _____,
2001, IT IS this _____ day of January, 2000, by
the United States District Court for the District of
Maryland, hereby ORDERED:
   3. That Defendant's Motion to Dismiss for Lack
   of Subject Matter Jurisdiction [6-1] BE, and the
   same hereby IS, DENIED and
   4. That the Clerk of the Court mail copies of this
   order to all counsel of record.

2000 WL 33124811 (D.Md.)


Motions, Pleadings and Filings (Back to top)


• 8:00CV01879  (Docket)
                         (Jun. 22, 2000)


END OF DOCUMENT


Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Mylan Pharmaceuticals Inc. v. Merck & Co., Inc.*,
no. 05-cv-1416 (M.D. Pa.)  (Judge Sylvia H. Rambo)

# Appendix Exhibit D

# *SmithKline Beecham Corp. v. Zenith Goldline Pharmaceuticals, Inc., No. CIV.A.00-CV-1393, 2000 WL 963165 (E.D. Pa. June 28, 2000)*

Not Reported in F.Supp.2d                                      Page 1
2000 WL 963165 (E.D.Pa.)
**(Cite as: 2000 WL 963165 (E.D.Pa.))**

**c**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

SMITHKLINE BEECH AM CORPORATION & BEECH
AM GROUP, p.l.c. Plaintiffs
v.
ZENITH GOLDLINE PHARMACEUTICALS, INC.
Defendant

**No. CIV.A.00-CV-1393.**

June 28, 2000.

Arthur Makadon, Jamie B. Bischoff, Ballard, Spahr,
Andrews and Ingersoll, Sally A. Steffen, Ballard, Spahr,
Andrews & Ingersoll, LLP, Phila, for Smithkline Beecham
Corporation, Beecham Group, P.L.C. , Plaintiffs.

Roy H. Wepner, Lerner, David, Littenberg, Krumholz and
Mentlik, William L. Mentlik, Lerner, David, Lettenberg,
Etal, Westfield, NJ, Wendi S. Meltzer, Hoyle, Morris &
Kerr, Phila, for Zenith Goldline Pharmaceuticals, Inc.,
Defendants.

MEMORANDUM & ORDER

KAUFFMAN, J.

*1 This action involves the alleged infringement of patents
for paroxetine hydrochloride. Plaintiffs SmithKline
Beecham    Corporation    and    Beecham    Group,
P.L.C.(collectively "SB") have sued Defendant Zenith
Goldline    Pharmaceuticals    ("Zenith")    for    patent
infringement. Zenith filed a counterclaim and SB filed a
Motion to Dismiss the counterclaim pursuant to
Fed.R.Civ.P. 12(b)(1). For the following reasons, the
Motion will be denied.

I. FACTUAL BACKGROUND

On March 16, 2000, SB filed its Complaint claiming that
Zenith is infringing three SB patents: 4,721,723 ("the '723
patent"), 5,900,423 ("the '423 patent") and 5,872,132 ("the
'132 patent") on paroxetine hydrochloride, the active
ingredient in SB's anti-depressant drug Paxil. SB also owns
a fourth patent, 5,789,449 ("the '449 patent") that involves
paroxetine hydrochloride, but has made no claim against
Zenith with regard to that patent.

On April 13, 2000, Zenith filed an Answer, Affirmative
Defenses, and Counterclaim arguing that the '449 patent is
invalid and seeking a declaratory judgment that it is not
infringing the '449 patent and an order that SB remove the
'449 patent from the Food and Drug Administration's
("FDA") Approved Drug Products with Therapeutic
Equivalents Evaluations (the "Orange Book"). [FN1] SB has
moved to dismiss Zenith's counterclaim pursuant to
Fed.R.Civ.P. 12(b)(1), arguing that the Court lacks subject
matter jurisdiction because Zenith's counterclaim does not
involve a present case or controversy.

> FN1. The Secretary of Health and Human Services
> is responsible for maintaining a list, commonly
> known as the "Orange Book," of "the official and
> proprietary name of each [new] drug which has
> been approved for safety and effectiveness...." 21
> U.S.C. § 355(6)(A)(i)(l). The list is to be revised
> every thirty days. Id. § 355(6)(A)(ii). Included in
> this list is the patent information supplied by a drug
> manufacturer when filing a New Drug Application
> ("NDA"). Id. § 355(6)(A)(iii). In filing an NDA,
> "[t]he applicant shall file with the application the
> patent number and the expiration date of any patent
> which claims the drug for which the applicant
> submitted the application or which claims a method
> of using such drug and with respect to which a
> claim of patent infringement could reasonably be
> asserted if a person not licensed by the owner
> engaged in the manufacture, use, or sale of the
> drug." Id. § 355(b)(1). If the patent information
> was unavailable or not required at the time the
> applicant originally filed its application, it is
> required to furnish the information prior to
> approval of the application or, if already approved,
> within thirty days of when the patent was issued.
> Id. § 355(b)(1) & (c)(2).

II. ANALYSIS

Zenith bears the burden of proof that subject matter
jurisdiction does in fact exist. Poling v. K. Hovanian
Enterprises, No. Civ. 99-431, 2000 WL 688485, * 10
(D.N.J. May 24, 2000). SB argues that this Court lacks
subject matter jurisdiction over Zenith's counterclaim for
declaratory judgment because there is no justiciable case or
controversy between Zenith and SB concerning the '449
patent. SB contends that because it did not raise any issues
regarding the '449 patent in its Complaint, no controversy
over the patent exists. In response, Zenith argues that the
'449 patent is so closely related to the patents genuinely at
issue in this case that its counterclaim is correctly before
this Court.

Westlaw.

Not Reported in F.Supp.2d
2000 WL 963165 (E.D.Pa.)
(Cite as: 2000 WL 963165 (E.D.Pa.))

The Declaratory Judgment Act provides that [i]n a case of actual controversy within its jurisdiction ..., any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration ..." 28 U.S.C. § 22001. The actual controversy requirement precludes a declaration about the validity of a patent unless the defendant has an objectively reasonable apprehension that it will face an infringement suit. *Mobil Oil Corporation v. Advanced Environmental Recycling Technologies, Inc., 826 F.Supp. 112, 114 (D.Del.1993)* (citing *International Medical Prosthetics Research Assoc. v. Gore Enterprise Holdings, Inc., 787 F.2d 572, 575 (Fed.Cir.1986)*). The objective test focusses on whether the patent holder's conduct "rose to a level sufficient to indicate an intent to enforce its patent." *Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 888 (Fed.Cir.1992)*. [FN2] When no express charges of infringement on a patent have been made, this Court considers the totality of the circumstances when making this objective determination. *Id.*

> FN2. The Federal Circuit has elaborated on the problem with drawing the line when assessing a case or controversy:
> No patent owner with any sense would open negotiations by assuring his opposite party that he does not intend to enforce his patent rights under any circumstances ... The two part test for declaratory judgment jurisdiction is designed to police the sometimes subtle line between cases in which the parties have adverse interests and cases in which those adverse interests have ripened into a dispute that may properly be deemed a controversy. The test for finding a "controversy" for jurisdictional purposes is a pragmatic one and cannot turn on whether the parties use polite terms in dealing with one another or engage in more bellicose saber rattling. The need to look to substance rather than form is especially important in this area, because in many instances ... the parties are sensitive to the prospect of a declaratory judgment action and couch their exchanges in terms designed either to create or defeat declaratory judgment jurisdiction. In the end, the question is whether the relationship between the parties can be considered a "controversy," and that inquiry does not turn on whether the parties have used particular "magic words" in communicating with each other.
> *EMC Corp. v. Norand Corp. 89 F.3d 807, 811-812 (Fed.Cir.1996)*.

**\*2** The totality of the circumstances in this case clearly reveals that Zenith is justified in its "reasonable apprehension" that it one day will face an infringement suit regarding the '449 patent. As Zenith points out, this action is the third in a series brought by SB over the past year in its attempts to enforce its paroxetine hydrochloride patents against a variety of defendants. [FN3] The similarities between the '449 patent and those that SB seeks now to enforce in the instant suit against Zenith cannot be ignored. [FN4] The Court notes the SB has not filed a covenant not to sue Zenith on the '449 patent. Nor has there been a final determination of noninfringement. *See Mobil Oil Corporation v. Advanced Environmental Recycling Technologies, Inc., 826 F.Supp. 112, 114 (D.Del.1993)*. Based on the vigor that SB has displayed with respect to protecting its paroxetine hydrochloride patents, it is not unforeseeable that it would similarly choose to sue Zenith for infringement of the '449 patent. Accordingly, SB's Motion to Dismiss Zenith's counterclaim for declaratory judgement of noninfringement will be denied.

> FN3. This Court currently has jurisdiction over the two other lawsuits filed in this district by SB to enforce its paroxetine hydrochloride patents. *See* Civil Action Nos. 99-2926 and 99-4304.

> FN4. The '732 patent claims a form of paroxetine hydrochloride hemihydrate, which is used in treatment as an anti-depressant. (Ex. A. to Cplt.) The '132 and '423 patents each claim a particular form of paroxetine hydrochloride anhydrate, also used in treatment "for depression and other disorders for which administration of selective serotonin reuptake inhibitors are indicated." (Ex. B, C. to Cplt.) The '449 patent claims a form of paroxetine hydrochloride to be used in treatment of "various psychiatric disorders and psychiatric symptoms with a class of pharmaceutical compounds called serotonin re-uptake blocking agents." (Ex. A. to Pl. Opp.)

An Order follows.

### ORDER

AND NOW, this 27th day of June, 2000, upon consideration of Counterclaim Defendants' Motion to Dismiss the Counterclaim against them pursuant to Fed.R.Civ.P. 12(b)(1), and Counterclaim Plaintiff's Opposition thereto, it is ORDERED that the Motion is DENIED.

2000 WL 963165 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d

2000 WL 963165 (E.D.Pa.)

**(Cite as: 2000 WL 963165 (E.D.Pa.))**

• 2:00CV01393 Docket) (Mar. 16, 2000)

END OF DOCUMENT

*Mylan Pharmaceuticals Inc. v. Merck & Co., Inc.*,
no. 05-cv-1416 (M.D. Pa.)  (Judge Sylvia H. Rambo)

# Appendix Exhibit E

# *General Latex and Chemical Corp. v. BASF Corp., C.A. No. 99-038-SLR, 1999 U.S. Dist. LEXIS 22904 (D. Del. July 14, 1999)*

LEXSEE 1999 US DIST LEXIS 22904

**GENERAL LATEX AND CHEMICAL CORPORATION, GENERAL LATEX AND CHEMICAL CORPORATION (GEORGIA), GENERAL LATEX AND CHEMICAL CORPORATION (NORTH CAROLINA), GENERAL LATEX AND CHEMICAL CORPORATION (OHIO), Plaintiffs, v. BASF CORPORATION, Defendant.**

**C.A. No. 99–038–SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1999 U.S. Dist. LEXIS 22904*

**July 14, 1999, Decided**

**DISPOSITION:** [*1] Defendant's motions to dismiss were denied; plaintiffs' motion to amend and supplement the first amended complaint were granted.

**COUNSEL:** For GENERAL LATEX AND CHEMICAL CORPORATION, GENERAL LATEX AND CHEMICAL CORPORATION (GEORGIA), GENERAL LATEX AND CHEMICAL CORPORATION (NORTH CAROLINA), GENERAL LATEX AND CHEMICAL CORPORATION (OHIO), plaintiffs: Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For BASF CORPORATION, defendant: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For BASF CORPORATION, counter-claimant: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For GENERAL LATEX AND CHEMICAL CORPORATION, GENERAL LATEX AND CHEMICAL CORPORATION (GEORGIA), GENERAL LATEX AND CHEMICAL CORPORATION (NORTH CAROLINA), GENERAL LATEX AND CHEMICAL CORPORATION (OHIO), counter-defendants: Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM ORDER

## I. INTRODUCTION [*2]

Currently before the court are pretrial motions filed by BASF Corporation ("defendant") and by General Latex and Chemical Corporation, General Latex and Chemical Corporation (Georgia), General Latex and Chemical Corporation (North Carolina), and General Latex and Chemical Corporation (Ohio) (collectively "plaintiffs"). Plaintiffs have filed a motion to amend and supplement their first amended complaint. (D.I. 26) Defendant has filed a motion to dismiss count one of the first amended complaint for lack of subject matter jurisdiction. (D.I. 7) Count one of that complaint seeks a declaratory judgment that plaintiffs' manufacture of rigid polyurethane foam systems does not infringe several of defendant's patents. Defendant also has filed a motion to dismiss counts two, three, and four of the first amended complaint. (D.I. 15) Counts two through four allege that defendant violated § 43(a)(1)(B) of the Lanham Act, interfered with plaintiffs' advantageous business relationships, and engaged in unfair competition. For the following reasons, the court shall deny defendant's motions and grant plaintiffs' motion.

## II. BACKGROUND

The court gleans the following facts from plaintiffs' [*3] first amended complaint. Plaintiffs and defendant compete in the manufacture and sale of "rigid polyurethane foam systems" for use in, inter alia, watercraft. Both parties sell this foam to boat manufacturers, who spray the foam into empty areas between the deck and the hull to ensure compliance with U.S. Coast Guard buoyancy standards. (D.I. 27 at 6) Plaintiffs' polyurethane foam system consists of two separate cylinders — one containing isocyanate and the other, polyol. These two chemicals are combined in the presence of a frothing, or blowing, agent known as 1,1,1,2-tetrafluoroethane HFC–134–a ("134–a Foam System"). The chemicals

react to form a "sprayable" polyurethane foam which later hardens. (D.I. 5, PP 9–11)

Plaintiffs accuse defendant of using its polyurethane foam patents (which plaintiffs allege are invalid) to dissuade Wood Manufacturing, Inc. d/b/a Ranger Boats ("Ranger Boats") from purchasing plaintiffs' 134–a Foam System. Specifically, plaintiffs allege that defendant threatened Ranger Boats with patent infringement litigation if it purchased plaintiffs' product. As a result of these alleged threats, Ranger Boats informed plaintiffs that it would no longer purchase [*4] the 134–a Foam System unless plaintiffs indemnified it from legal action taken by defendant. (D.I. 5, PP 16–17)

Plaintiffs also allege that they received letters from defendant's chief patent counsel that impliedly threatened litigation and accused plaintiffs of patent infringement. (D.I. 8, Exs. A–C) Two of these letters "invited" plaintiffs to purchase a license for defendant's patented frothing technology. (D.I. 8, Exs. A, B) A third letter informed plaintiffs that "it has come to our attention that some of General Latex and Chemical Corporation's polyurethane systems [including the 134–a Foam System] may fall within the scope of one or more" of defendant's patents. (D.I. 8, Ex. C) In this letter, defendant's senior patent attorney also noted that, "BASF places a very high value on its intellectual property rights." Through outside patent counsel, plaintiffs responded that its 134–a Foam System did not fall within the scope of any of defendant's valid patent claims. (D.I. 8, Ex. D) In defendant's reply to this letter, its senior patent attorney stated that, although plaintiffs were licensees of other patents, this fact "would not remove BASF Corporation's patents from potential [*5] patent infringement consideration." (D.I. 8, Ex. E) Shortly after the receipt of this letter, plaintiffs filed the declaratory judgment action at bar.

## III. DISCUSSION

### A. Defendant's Motion to Dismiss Count One

Pursuant to *Fed. R. Civ. P. 12(b)(1)*, defendant moves the court to dismiss plaintiffs' declaratory judgment action for lack of subject matter jurisdiction. At issue is whether plaintiffs' complaint presents a justiciable "case or controversy" entitling plaintiffs to federal jurisdiction. Jurisdiction over plaintiffs' patent claim can arise only by virtue of the Declaratory Judgment Act (the "Act"), *28 U.S.C. §§ 2201* and *2202*. Section 2201(a) of the Act provides in pertinent part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other

legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

The Act, which embodies the "case or controversy" requirement of Article III of the Constitution, thus requires that an actual controversy exist between the parties. [*6] See *Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 633–34 (Fed. Cir. 1991)*. The plaintiff has the burden of establishing the existence of an actual case or controversy, see *id. at 634,* which depends on "'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *EMC Corp. v. Norand Corp., 89 F.3d 807, 810 (Fed. Cir. 1996)* (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 85 L. Ed. 826, 61 S. Ct. 510 (1941))*. The court must determine whether an actual controversy existed at the time of the complaint's filing — here, January 29, 1999. See *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 734 n.2 (Fed. Cir. 1988)*.

The Federal Circuit has adopted a two prong test for determining the existence of an actual controversy. There must be both

> (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff [*7] that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

*BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed. Cir. 1993)*. In the present case, both parties dispute only the first prong of this test. The court, therefore, confines its analysis to whether defendant's actions placed plaintiffs in reasonable apprehension of an infringement suit.

Several factors support a finding that plaintiffs reasonably apprehended suit by defendant. Chief among them is defendant's alleged intimidation of Ranger Boats and that company's resulting request for indemnification. The Federal Circuit in Arrowhead found that communications with a plaintiff's potential customer, which caused the customer to request indemnification from the plaintiff, contributed to a reasonable apprehension of suit by the plaintiff. See *Arrowhead, 846 F.2d at 737.* The fact that Ranger Boats responded to defendant's alleged threats by refusing to order plaintiffs' 134–a Foam System also supports plaintiffs' apprehension

of suit. See *Grafon Corp. v. Hausermann, 602 F.2d 781, 784-85 (7th Cir. 1979).* [*8] Further, defendant never has assured plaintiffs that it would not enforce its patents. The Federal Circuit has noted that a patentee's failure to give such an assurance is relevant to a court's jurisdictional inquiry. See *BP Chems., 4 F.3d at 980.*

Defendant's written correspondence with plaintiffs also supports a finding of a justiciable controversy. Defendant argues that its letters, which stated only that plaintiffs' foam system "may infringe" defendant's patents, could not have created a reasonable fear of suit. Defendant insists that its letters were merely "invitations to license" its product and, as such, did not create reasonable apprehension of suit. In assessing the reasonableness of a declaratory plaintiff's apprehension of suit, courts have looked to the "totality of the circumstances" surrounding the defendant's actions. See, e.g., *BP Chems., 4 F.3d at 978.* The test for finding a "controversy" under the Act is a "pragmatic one and cannot turn on whether the parties used polite terms in dealing with one another." *EMC Corp. v. Norand Corp., 89 F.3d 807, 812 (Fed. Cir. 1996).* "In light of the subtleties in lawyer language, [*9] " *Arrowhead, 846 F.2d at 736,* courts have not required express charges of infringement or similar "magic words" to create a justiciable controversy. See id.; *EMC, 89 F.3d at 812.* Thus, the fact that defendant never expressly charged plaintiffs with infringement is not dispositive. Courts must look to the "realities of business life" so that a patentee may not succeed in extra-judicial patent enforcement by employing ambiguous "lawyerisms" and "scare-the-customer-and-run tactics." See *Arrowhead, 846 F.2d at 735.*

In light of these pragmatic considerations, the court concludes that defendant's letters (viewed alongside defendant's alleged communications with Ranger Boats) reinforced plaintiffs' apprehension of suit. As such, the court concludes that an actual controversy existed between the parties as of the filing of plaintiffs' complaint. n1 Accordingly, the court has subject matter jurisdiction to entertain plaintiffs' declaratory judgment action, and the court shall deny defendant's motion to dismiss count one of the amended complaint.

> n1 Defendant also quibbles with the language used in plaintiffs' amended complaint. Defendant argues that plaintiffs alleged only that defendant's conduct "created a reasonable basis" to apprehend suit whereas, in order for declaratory jurisdiction to lie, plaintiffs should have pled that "it actually fears or expects such a suit." (D.I. 8 at 6) The court declines to elevate form above substance by requiring plaintiffs to recite such "magic words."

[*10]

## B. Defendant's Motion to Dismiss Counts Two Through Four

In count two of the complaint, plaintiffs assert that "at all material times [defendant] knew that [its] patents were invalid and unenforceable and knew that it had obtained those patents by engaging in fraud on the Patent & Trademark Office." (D.I. 5, P 37) Plaintiffs incorporate this allegation by reference in counts three and four of their complaint. Relying upon *Fed. R. Civ. P. 9(b),* defendant moves the court to dismiss counts two through four because these counts do not allege fraud on the Patent & Trademark Office ("PTO") with sufficient particularity. Plaintiffs assert in rebuttal that fraud is not an essential element of the causes of action alleged in counts two through four and, therefore, Rule 9(b) does not apply. At issue, then, is whether counts two through four of plaintiffs' complaint are subject to the heightened pleading requirements of Rule 9(b) and, if so, whether these counts satisfy that standard.

Generally, claims for relief must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a).* Moreover, "each averment of a pleading shall [*11] be simple, concise, and direct. No technical forms of pleadings or motions are required." *Fed. R. Civ. P. 8(e).* Rule 9(b) provides an exception to this general notice pleading standard. That rule requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b).* "The purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged and to prevent false or unsubstantiated charges." *Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1998).* By its terms, Rule 9(b) applies only to averments of fraud or mistake; however, courts have concluded that "the requirements of the rule apply to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." See *Toner v. Allstate Ins. Co., 821 F. Supp. 276, 283 (D. Del. 1993)* (citing cases applying Rule 9(b) to claims of misrepresentation, conspiracy to commit fraud, negligent misrepresentation, and claims based on the False Claims Act and the Securities Act of 1933); *In re Healthco Int'l, Inc. Sec. Litig., 777 F. Supp. 109, 113 (D. Mass. 1991)* [*12] (finding Rule 9(b) applicable to "all claims where 'fraud lies at the core of the action'"); see also *Shapiro v. UJB Fin. Corp., 964 F.2d 272, 288 (3d Cir. 1992)* (applying Rule 9(b) to Securities Act claims "grounded in fraud").

Although defendant asserts otherwise, none of the claims alleged in counts two through four are

"grounded in" plaintiffs' allegation of fraud on the PTO. See *Shapiro, 964 F.2d at 288.* Nor is such fraud the "gravamen" or "at the core" of those counts. See *Toner, 821 F. Supp. at 283; In re Healthco, 777 F. Supp. at 113.* Although counts two through four include an allegation that defendant's patents are invalid due to fraud on the PTO, the factual allegations supporting counts two through four focus chiefly on other bases for invalidity. Specifically, the allegations included by reference in counts two through four assert that defendant's patents are invalid because (1) defendant offered to sell, and sold, polyurethane systems covered by its patents in violation of the "on sale bar," (2) defendant's product was known or used by others before defendant invented it, (3) defendant's patents were [*13] in public use more than one year prior to the patents' application dates, (4) plaintiffs, not defendant, invented the patented products, and (5) defendant's patents were obvious. (D.I. 5, PP 21–28) As such, plaintiffs' "fraud on the PTO" charge does not form the "core" of counts two through four. Indeed, plaintiffs could eliminate the reference to fraud on the PTO entirely and still have viable claims under counts two through four. n2 As such, it is difficult to understand how (as defendant suggests) counts two through four "sound in fraud." (D.I. 31 at 2) Because the court finds that Rule 9(b) does not apply to counts two through four of the amended complaint, the court declines to address whether those counts satisfy Rule 9(b)'s heightened pleading requirements. The court shall deny defendant's motion to dismiss counts two through four of the complaint.

> n2 Defendant challenges only the sufficiency of plaintiffs' allegation of "fraud on the PTO" and not plaintiffs' other allegations. Accordingly, the court shall assume for purposes of this motion that

plaintiffs' other factual allegations state claims for relief under counts two through four.

[*14]

### C. Plaintiffs' Motion to Amend and Supplement the First Amended Complaint

Plaintiffs move the court to amend and supplement their first amended complaint with allegations primarily relating to the details of the indemnification agreement with Ranger Boats. (D.I. 26, Ex. B at PP 16–20) Defendant objects, contending that the proposed amendments include post-filing facts that the court may not consider in determining whether declaratory jurisdiction exists. The court, however, did not consider these facts in denying defendant's motion to dismiss count one of the amended complaint. In light of this decision and Rule 15(a)'s liberal amendment policy, the court sees no reason why plaintiffs should not be allowed to amend and supplement their first amended complaint. Accordingly, the court shall grant plaintiffs' motion.

### IV. CONCLUSION

At Wilmington, this 14th day of July, 1999, IT IS ORDERED that:

1. Defendant's motion to dismiss count one of the first amended complaint (D.I. 7) is denied;

2. Defendant's motion to dismiss counts two through four of the first amended complaint (D.I. 15) is denied;

3. Plaintiffs' motion to amend and supplement the first amended complaint [*15] (D.I. 26) is granted.

Sue L. Robinson

United States District Judge

## CERTIFICATE OF SERVICE

I, Amy D. Brody, Esq., one of the attorneys for plaintiff, hereby certify that the foregoing **Appendix to Mylan's Memorandum of Law in Opposition to Merck's Motion to Dismiss Submitting Electronically Available Case Law Pursuant to LR 7.8** (with Exhibits A-E) has been served this 4th day of October, 2005 by the Court's Electronic Case Filing (ECF) system to the following:

Brian P. Downey (PA 59891)
Justin G. Weber (PA 89266)
PEPPER HAMILTON LLP
200 One Keystone Plaza
North Front and Market Streets
P.O. Box 1181
Harrisburg, Pennsylvania 17108-1181

and by Fed Ex® (overnight delivery) to the following:

| | |
|---|---|
| Robert L. Baechtold | Edward W. Murray |
| Stevan J. Bosses | Mary J. Morry |
| FITZPATRICK, CELLA, HARPER, & SCINTO | Merck & Co., Inc. |
| 30 Rockefeller Plaza | 126 East Lincoln Avenue |
| New York, New York 10112-3801 | P.O. Box 2000 |
| | Mail Code RY28-320 |
| | Rahway, New Jersey 07065 |

_____/s Amy D. Brody_____
Amy D. Brody (IL 6272447)
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois  60610
Telephone: (312) 222-6344
Facsimile: (312) 222-6345
abrody@rmmslegal.com

*Counsel for Mylan Pharmaceuticals Inc.*
